UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

CHARLES R. LIVECCHI and
C.R.L. MANAGEMENT, INC.,

                Defendants.

DECISION & ORDER

03-CV-6451P

---

## PRELIMINARY STATEMENT

        This case is another, hopefully final, addition to the ever-expanding body of litigation arising from the defendants' ownership and management of a multifamily project known as Cambridge Court Apartments, which was financed through a mortgage insured by the United States Department of Housing and Urban Development ("HUD").  Ultimately, in November 1998, HUD foreclosed on the property due to defendants' failure to remit the required mortgage payments, and the property was sold to a third party.  Several years later, the United States commenced this action against Charles Livecchi and the company through which he managed Cambridge Court, C.R.L. Management, Inc., under 12 U.S.C. § 1715z-4a(a)(1)(B).  That statute, commonly known as the equity skimming statute, permits the government to sue any owner or operator of a multifamily project financed through a HUD-insured mortgage "to recover any assets or income used . . . in violation of a regulatory agreement that applies to [such] project."  18 U.S.C. § 1715z-4a(a)(1)(B).

1

Currently pending before this Court for decision, pursuant to 28 U.S.C. § 636(c), are motions by both parties for summary judgment. The government has moved for judgment in its favor on its equity skimming claim and on the three counterclaims asserted by defendants in their Answer. The defendants have cross-moved for judgment in their favor, arguing that the government has not satisfied the prerequisites of bringing suit under the equity skimming statute and that such an action is in any event barred by the statute of limitations. The defendants have also moved for leave to assert an equitable counterclaim of recoupment, which the government opposes. Oral argument on each of these motions was heard on May 20, 2005.

## FACTUAL BACKGROUND

### The Regulatory Agreement

Defendant Charles Livecchi ("Livecchi") purchased Cambridge Court Apartments ("the Project") in 1982, and defendant C.R.L. Management, Inc. ("C.R.L."), of which Livecchi was the President, was the managing agent for the Project. (Docket # 25, ¶ 1-3; Docket # 30, Defendants' Response to Plaintiff's Statement of Undisputed Facts ("Defendants' Response"), ¶¶ 1-3). In approximately August 1992, Livecchi refinanced the Project by obtaining a mortgage in the amount of $2,390,700 from Continental Securities Corporation ("Continental"). (Docket # 26, Exhibit ("Ex.") C, ¶ 6; Docket # 30, Affidavit of Charles R. Livecchi ("Livecchi Aff."), ¶ 3). The mortgage, in turn, was insured by HUD, which agreed to relieve Livecchi of any personal liability in the event that a mortgage default occurred. (Docket # 25, ¶ 4; Docket # 30, Defendants' Response, ¶ 4; Docket # 26, Ex. C, ¶ 6; Docket # 26, Ex. N, ¶ 17). In consideration for that insurance, Livecchi signed a Regulatory Agreement with HUD on August 20, 1992 (the

"Regulatory Agreement" or "Agreement"), which contained certain restrictions on the manner in which the Project could be operated, including a restriction on Livecchi's use of income derived from the Project.  (Docket # 25, ¶ 6; Docket # 30, Defendants' Response, ¶ 6; Docket # 26, Ex. N).

Specifically, the Agreement provided that Livecchi was prohibited from "mak[ing], or receiv[ing] and retain[ing], any distribution of assets or any income of any kind of the project except surplus cash."  (Docket # 26, Ex. N., ¶ 6(e)).  "Surplus cash" was defined in the Agreement to mean any cash remaining after the payment of required mortgage payments and deposits to the "reserve fund for replacements."  (*Id.* at ¶ 13(f)).  "Distribution" was defined to mean "any withdrawal or taking of cash or any assets of the project . . . excluding payment for reasonable expenses incident to the operation and maintenance of the project."  (*Id.* at ¶ 13(g)).  The parties agree that, taken together, these provisions prohibited Livecchi from retaining any income in excess of reasonable operating and maintenance expenses during any period in which the mortgage was in arrears.  (Docket # 25, ¶¶ 8-9; Docket # 30, Defendants' Response, ¶¶ 8-9).

The Agreement also required Livecchi to make certain payments into a separate account, defined as a "reserve fund for replacements," which functioned as an escrow account from which payments for repairs and maintenance could be made.  (Docket # 26, Ex. N, ¶ 2(a)). According to the Agreement, Livecchi was obligated to make an initial deposit of $200,000 to the fund, and thereafter to make monthly payments of $2013.  (*Id.*).  Disbursements from such fund, the Agreement specified, "may be made only after receiving the consent in writing of the [HUD] Secretary."  (*Id.*).

3

Livecchi was also obligated by the terms of the Agreement to provide to the Secretary annual financial reports of the Project.  (*Id.* at ¶ 9(e)).  Such reports were to be "prepared in accordance with the requirements of the Secretary."  (*Id.*).

## Events Preceding Defendants' Mortgage Default

In February 1993, six months after the execution of the Regulatory Agreement, HUD officials in the Buffalo, New York regional office notified Livecchi that the funding requirements for the reserve fund for replacements ("RFR" or the "fund") were being increased. (Docket # 30, Livecchi Aff., ¶ 7 and Ex. E).  Specifically, Livecchi was advised that the initial deposit of $200,000 needed to be increased to $289,00, which he could accomplish either by withholding requests for payment from the RFR for a period of six years or by increasing monthly RFR escrow payments until the $289,000 was funded.  (*Id.*).

The government asserts, without contradiction by Livecchi, that the $289,000 balance was never fully funded.  (Docket # 38, Ex. B, ¶ 3).  It is not completely clear, however, whether Livecchi ever made any monthly RFR payments above the $2013 specified in the Agreement, although he does not assert that he did.  Moreover, while it is evident that some RFR requests submitted by Livecchi were paid during the period when the $289,000 balance was in effect, despite the fact that the fund's balance was below $289,000, it is unclear whether there were any other RFR requests that were denied on the grounds that the fund's balance was below the required amount.[1]  That confusion notwithstanding, it is clear that in March 1994, HUD

---

[1] This Court has been provided with documentation reflecting two RFR requests submitted by Livecchi between 1992 and 1994, each of which HUD authorized for payment.  (*See* Docket # 30, Livecchi Aff., Ex. E; Docket # 33, Ex. A, Attachments 1 and 2).  No documentation has been submitted to reflect that any RFR requests

4

rescinded the $89,000 increase and in fact lowered the required balance to $132,000, well below

the $200,000 agreed to in the Regulatory Agreement.  (Docket # 33, Ex. A, ¶ 9 and Attachment

8).

        With respect to the post-March 1994 period, the government represents that the

majority of RFR requests were paid.  (Docket # 33, Ex. A, ¶ 6).  Although some may not have

been paid when initially submitted, all of the requests between March 1994 and February 1996

apparently were eventually paid, with the last payment occurring on February 7, 1996.  (Docket

# 33, Ex. A, Attachments 1-5; Docket # 30, Livecchi Aff., Ex. H at 6-7, ¶¶ 7-10).

        The parties agree that since the February 7, 1996 authorization, two RFR requests

were submitted by Livecchi – one on November 18, 1996 and one on January 15, 1997 – that

were denied by HUD.  (Docket # 30, Livecchi Aff., Ex. H at 7, ¶ 10; Docket # 38, Ex. C).  The

amounts of the requested payments have not been disclosed to the court, nor have copies of the

requests been submitted.  According to a letter from a HUD official to Livecchi, dated March 27,

1996, the payments were not authorized because Livecchi breached the Regulatory Agreement by

failing to submit audited financial statements for 1995, failing to maintain adequately books and

records for the Project and failing to maintain the property in good condition.  (Docket # 38, Ex.

C).  Livecchi disputes the proffered deficiencies.  (Docket # 30, Livecchi Aff., ¶¶ 16-18).

        In sum, with respect to RFR requests, this Court has been presented with credible

evidence that between the time that the Regulatory Agreement was executed in 1992 and the time

that Livecchi began to pay less than the full monthly payments required by the Agreement (in

March 1997), only two RFR requests remained unpaid.  While Livecchi contends in his affidavit

---

were denied during that period for failure to maintain the required RFR balance.

that "[w]ithout any authority in the Regulatory Agreement or Handbook, HUD withheld large sums of money from the RFR needed for maintenance and repair" (Docket # 30, Livecchi Aff., ¶ 18), he has submitted no documentary support to demonstrate, or even suggest, that any requests other than the November 1996 and January 1997 requests remained unpaid in March 1997.  He suggests that his inability to offer documentary evidence results from the fact that he was evicted from his office following the foreclosure sale and unable to recover any of his business records.  (*Id.* at ¶ 48).  Accepting this as true, Livecchi still has offered no details in his affidavit of any particular RFRs that were denied by HUD and never paid, such as the approximate dates, amounts or purpose of such requests.

### Livecchi's Failure to Make the Required Mortgage Payments Between March 1997 and December 1998

In or about March of 1997, Livecchi received an Internal Revenue Service Form 1099 statement reflecting that interest in the amount of $5,412.93 had been earned on the RFR account.  (*Id.* at ¶ 19).  Following receipt of that statement, and the refusal by Continental to pay the interest to Livecchi because he was allegedly in breach of the Regulatory Agreement by failing to submit 1995 certified financial statements, Livecchi forwarded his March mortgage payment to Continental, less the amount of the required RFR payment ($2,013).  (*Id.* at ¶ 19-20; Docket # 30, Defendants' Counter-Statement, ¶ 1).  According to Livecchi, he directed Continental to apply the RFR interest to cover the difference.  (Docket # 30, Livecchi Aff., ¶ 20). In April, he paid the same amount and issued the same direction to Continental.  (*Id.*).

Continental advised Livecchi that his payments were inadequate and could not be applied in the manner he sought.  (Docket # 30, Livecchi Aff., Ex. I).  Continental applied the payment to the RFR first, resulting in a delinquent mortgage balance.  (Docket # 30, Livecchi Aff., ¶ 21 and Ex. I).  Notwithstanding this notification, Livecchi did not forward any mortgage payments either to HUD or Continental thereafter (Docket # 25, ¶ 11; Docket # 30, Defendants' Response, ¶ 11), claiming instead to have deposited sums representing a portion of the required payments into a separate bank account that he maintained.  (Docket # 30, Defendants' Response, ¶ 11).

On May 1, 1997, Continental notified HUD of its intent to assign the mortgage to HUD.  (Docket #30, Livecchi Aff., ¶ 22; Docket # 30, Defendants' Counter-Statement, ¶ 4).  That assignment was filed in August 1997.  (Docket # 30, Livecchi Aff., ¶ 23; Docket # 30, Defendants' Response, ¶ 15; Defendants' Counter-Statement, ¶ 5).  In July 1997, HUD wrote Livecchi outlining numerous alleged violations of the Agreement, including his failure to make the required mortgage payments.  (Docket # 30, Livecchi Aff., Ex. I).  HUD advised Livecchi that in order to avoid foreclosure, he would be required to pay all mortgage delinquencies or to submit a plan to bring the mortgage current within thirty-six months of assignment.  (*Id.*).  Any such plan, the letter explained, "must address all physical repairs needed to the property and all regulatory deficiencies."  (*Id.*).

According to Livecchi, from July 1997 until the foreclosure sale on November 12, 1998, he expended "nearly continuous effort[s]" to negotiate "several workout arrangements with HUD, including recasting the mortgage, a modification of the note, refinancing through another mortgagee without HUD involvement, purchasing the property outright, or arranging a purchase

7

through outside investors." (Docket # 30, Livecchi Aff., ¶ 27).  While HUD does not contest that Livecchi undertook certain efforts to retain ownership of the property or to sell it to outside investors, HUD maintains that these efforts fell short of what was required to cure the default.  According to HUD, HUD was well within its contractual and legal rights in selling the Project to a third party at a foreclosure sale.  (Docket # 24 at 25).  Livecchi strongly disagrees.  (Docket # 30, Memorandum of Law, 21-24).

     As Livecchi was notified at least one month earlier, HUD scheduled a foreclosure sale for the Project on November 12, 1997.  (Docket # 30, Livecchi Aff., Ex. L at 14).  Hours before the sale was to occur, a group of investors to whom Livecchi had agreed to sell the Project, sought a temporary restraining order from United States District Judge Charles J. Siragusa cancelling or postponing the sale.  (Docket # 30, Livecchi Aff., ¶¶ 33-34).  Following a hearing, Judge Siragusa denied Livecchi's application, but mediated an agreement between the parties to delay the sale for two hours to permit Livecchi to obtain and deliver to HUD the $557,397.32 necessary to cure the default.  (Docket # 30, Livecchi Aff., ¶ 35 and Ex. L at 30-31).

     The sale proceeded as scheduled, and the Project was sold to a third party for $1,125,000 (Docket # 25, ¶ 17; Docket # 30, Defendants' Response, ¶ 17), an amount which Livecchi contends was less than the $1,800,000 he was willing to pay to purchase the property in January 1998.  (Docket # 30, Livecchi Aff., ¶ 40).  He claims that he appeared at the sale with a bank check for $75,000 payable to himself that he was willing to provide as earnest money for the investors, which HUD refused to accept.  (*Id.* at ¶ 38).  HUD admits it refused to accept the check, maintaining that the bidding requirements were clear and that Livecchi did not meet them by failing to present a check made payable to HUD.  (Docket # 24 at 25).  The deed to the

8

property was transferred on December 16, 1998 to Dodge Street, LLC.  (Docket # 25, ¶ 18;

Docket # 30, Defendants' Response, ¶ 18).


**Previous Lawsuits Relating to the Regulatory Agreement Between HUD and Livecchi**

        In 2002, Livecchi filed suit in United States District Court for the Western District

of New York against Continental, HUD and the Rochester Housing Authority ("RHA").  (Docket

# 30, Livecchi Aff., ¶ 50; *see Livecchi v. U.S. Department of Housing and Urban Development,

et al.*, Docket # 02-CV-6570 (W.D.N.Y. 2002); *see also* Letter to this Court from Robert G.

Trusiak, dated July 26, 2005, forwarding copy of appendix filed by Livecchi in connection with

his pending appeal of that case.)  That suit challenged Continental's and HUD's alleged failure to

enter into a work-out agreement with Livecchi, and HUD's alleged failure to provide Livecchi

with a calculation of the amount necessary to cure the default.  (*Id.*).  On June 18, 2003, United

States District Judge David G. Larimer granted summary judgment in favor of Continental,

finding that Livecchi could not demonstrate that it was Continental's action that occasioned the

foreclosure proceeding and that Continental had no duty to take funds from the RFR and apply

them towards the mortgage.[2]  (*Id.*).  On November 4, 2004, Judge Larimer dismissed with

prejudice the suit against HUD and RHA based upon Livecchi's failure to prosecute it.  (*Id.*).

        In March 2002, a criminal indictment was returned against Livecchi charging him

with equity skimming in violation of 12 U.S.C. § 1715z-19.  (Docket # 30, Livecchi Aff., ¶ 52;

*see United States v. Livecchi*, Docket # 02-CV-6022 (W.D.N.Y. 2002)).  The indictment was

---

[2] Livecchi has appealed that decision to the Second Circuit Court of Appeals, and the appeal is pending. *Livecchi v. U.S. Department of Housing and Urban Development, et al.*, appeal docketed, No. 04-6416 (2d Cir. December 13, 2004).

dismissed on the government's motion on May 21, 2003.  (*Id.*).  Thereafter, on September 12,

2003, the government initiated this civil action against Livecchi based upon the civil equity

skimming statute, 12 U.S.C. § 1715z-4a.[3]  (Docket # 1).


## **DISCUSSION**

### I.  <u>Standard for Summary Judgment</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  In reaching this determination, the court must assess whether

there exist any disputed material facts and, in so doing, must resolve all ambiguities and draw all

reasonable inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248-49 (1986); *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991).

A fact is "material" only if it has some affect on the outcome of the suit.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir.

1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Bryant*

*v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact, after which the nonmoving party must come forward with

---

[3]  Considering the lengthy litigation history between the parties, I commend them for the exceptionally professional manner in which they have litigated this action, which is apparent from a review of the record in this case.

sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based

upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant*

*v. Maffucci*, 923 F.2d at 982 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986)).  The party seeking to avoid summary judgment "must do more than make

broad factual allegations and invoke the appropriate statute.  The [party] must also show, by

affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can

only be resolved at trial."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll*

*v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

> As the Second Circuit has explained:
>
> [T]he trial court's task at the summary judgment motion stage of
> the litigation is carefully limited to discerning whether there are
> any genuine issues of material fact to be tried, not to deciding
> them.  Its duty, in short, is confined at this point to issue-finding; it
> does not extend to issue-resolution. . . .  It must be kept in mind
> that only by reference to the substantive law can it be determined
> whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv. P'ship,* 22 F.3d 1219 (2d Cir. 1994).


## II.   Defendants' Motion for Summary Judgment Dismissing Plaintiff's Equity Skimming Claim

Defendants move for summary judgment in their favor on the government's

equity skimming claim (the first cause of action) on two separate grounds.  First, they argue that

the government has failed to state a claim under 12 U.S.C. § 1715z-4a because it did not satisfy

the statutory prerequisites to bringing suit.  (Docket # 30, Memorandum of Law, 35-37).  Second,

they argue that the suit is barred by the six-year statute of limitation applicable to actions brought under the statute.  (*Id.* at 26-28).  The government opposes both motions.

A.  **The Statutory Language**:  At the time this suit was filed, Section 1715z-4a provided in relevant part as follows:

> The Secretary of Housing and Urban Development (referred to in this section as the "Secretary") may request the Attorney General to bring an action in a United States district court to recover any assets or income used by any person in violation of . . .
>     (B) a regulatory agreement that applies to a multifamily project whose mortgage *is insured or held* by the Secretary under section 1701g of this title.

12 U.S.C. § 1715z-4a(a)(1)(B) (emphasis added).  In 2004, the language of subsection (B) above was amended to provide "a regulatory agreement that applies to a multifamily project whose mortgage *is or, at the time of the violation, was insured or held* by the Secretary under Section 1701 of this title."  *Id.* (emphasis added).  This Court has been unable to find any legislative history addressing the change.

It is undisputed that when suit was filed, HUD no longer insured or held the mortgage at issue in this case.  Although the record does not reflect the exact date upon which HUD requested the Attorney General to file suit, that date likely postdated the foreclosure sale.  According to the government, it did not possess the Project's financial statements for 1997 and 1998 until they were compelled from Livecchi on August 21, 2000, at which time HUD discovered that defendants had skimmed equity from the project.  (Docket # 33, Ex. A at ¶ 15).  Assuming that HUD no longer insured or held the mortgage at the time HUD requested commencement of this action, Livecchi moves to dismiss the equity skimming claim on the grounds that the government's action was unauthorized by the statute.  The government counters

12

that Livecchi's interpretation is inconsistent with the statute's purpose, noting that the statute has in fact been used by the government to seek relief from owners and operators of multifamily projects whose mortgages are no longer insured or held by HUD.

Having carefully considered the arguments of both sides, and recognizing the complete dearth of any authority addressing this issue,[4] I conclude that summary judgment should not be awarded to Livecchi on this basis.  Livecchi appears to argue that the purpose behind the statute was to provide the government with a choice of remedies in the event of a regulatory agreement breach due to non-payment of the mortgage: foreclosure or double damages for equity skimming.  (*See* Docket # 30, Memorandum of Law, 36 ("The provision's language provides no recourse against a property owner where the Secretary has already elected its remedy under the Regulatory Agreement by sending the property into foreclosure")).  To the contrary, the purpose underlying the equity skimming statute was to provide the government with a greater deterrent by affording it an additional remedy beyond the traditional remedies of foreclosure and suit for breach of contract.  *See* H.R. Rep. No. 100-122(I), 115, reprinted in 1987 U.S.C.A.N. § 317, 3431 (statute "[e]xpands the Secretary's ability to deter the use of assets and income of multifamily housing projects, under the National Housing Act, in violation of the project's regulatory agreement or applicable regulations, by providing a statutory double damages civil recovery remedy").  *See United States v. Cofield*, 215 F.3d 164, 171 (1st Cir. 2000) ("as the legislative history confirms, the double damages provision was adopted simply to provide a greater deterrent to violations") (internal quotation omitted).  As the statute itself states, "[t]he

_____

[4]  This Court's review of all of the reported decisions addressing 12 U.S.C. § 1715z-4a has revealed no authority addressing the meaning of the challenged language.

remedy provided by this section is in addition to any other remedies available to the Secretary or the United States."  12 U.S.C. § 1715z-4a(e).

To read the statute to preclude suit where foreclosure has already occurred would act as a significant incentive to delay foreclosure, notwithstanding the cost of that delay to taxpayers, in order to develop an adequate factual basis for an equity skimming action.  *See United States v. Winthrop Towers*, 628 F.2d 1028, 1036 (7th Cir. 1980) ("In exercising its discretion HUD may decide to foreclose in order to minimize losses from its insurance fund. HUD's interest in moving expeditiously to minimize such losses by foreclosure accords with national housing policy because such foreclosure preserves the assets of the insurance fund so that more projects may be insured in the future.  Public money should not be put unnecessarily at risk by untoward administrative vacillation or judicial delays.").  In certain cases, and the government contends that this is just such a case, an action for foreclosure will be warranted before the basis for any action for equity skimming is apparent (because such action depends upon proof of income in excess of reasonable expenses).

Livecchi argues that his interpretation of the statute is supported by the language of subsection (c) which permits the Secretary to apply any statutory recovery to "the project or applicable insurance fund under the National Housing Act."  (*See* Docket # 30, Memorandum of Law, 36; 12 U.S.C. § 1715z-4a(c)).  As Livecchi maintains, "[p]ermitting the Secretary to bring an action after it has foreclosed on the property renders meaningless the provisions of this subsection which permit application of a recovery to the project or the applicable insurance fund. That argument, however, wholly ignores the remainder of subsection (c), which also permits the Secretary to apply the recovery "to the Defendant for use by the appropriate office within the

14

Department for administrative costs related to enforcement of the requirements of the various programs administered by the Secretary." 12 U.S.C. § 1715z-4(c).

   While sparse case law exists interpreting Section 1715z-4a, that authority does include two cases in which an action for equity skimming was instituted (based on the pre-2004 statutory language) following foreclosure proceedings. *See United States v. Retirement Services Group*, 302 F.3d 425 (5th Cir. 2002) (action under Section 1715z-4a commenced nearly six years after foreclosure; court reverses summary judgment awarded to HUD and remands for further proceedings); *United States v. Schlesinger*, 88 F. Supp. 2d 431 (D. Md. 2000) (action under Section 1715z-4a commenced eighteen months after foreclosure; court grants in part and denies in part parties' summary judgment motions on Section 1715z-4a claims). Neither case addresses the statutory language cited by Livecchi, and this Court has been unable to find any other decision that addresses it.

   In sum, for the reasons stated above, I agree with the government that Livecchi's statutory interpretation would frustrate the purpose of the statute and should be rejected. *See*, *e.g.*, *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1045 (2d Cir. 1985) (refusing to interpret statute "in any way that apparently frustrates the statutes's goals, in the absence of a specific congressional intention otherwise"); *Capitano v. Secretary of Health and Human Services*, 732 F.2d 1066, 1076 (2d Cir. 1984) (rejecting proposed interpretation of statutory language as unreasonable because it would "violate[] the letter or spirit of the statute"). The more logical interpretation of the challenged language, and the one most consistent with the statute's purpose, is that it authorizes suit by the Attorney General in federal court to recover assets or income used in violation of certain regulatory agreements. Those regulatory agreements

are simply described, perhaps inartfully, in the present tense as those applicable to multifamily projects with HUD-insured mortgages.

As a final matter, I note that a linguistic inconsistency remains despite the 2004 change. Specifically, the term "applies" was left in the present term; to be entirely consistent, the term ought to have been modified to read "applies or, at the time of the violations, applied." Instead, from a grammatical perspective, the amended section still restricts actions to those seeking to recover assets used in violation of a regulatory agreement that "*applies*" to a multifamily project. Once the HUD-insured mortgage has been foreclosed on and the deed transferred, it is hard to see how the regulatory agreement continues to apply to the project. Just as I believe it would be absurd to rely on that grammatical oversight to support an interpretation of the statute barring actions not brought prior to foreclosure, I believe Livecchi's interpretation would lead to a result similarly at odds with the statute's purpose.

**B.  The Statute of Limitations**:  Defendants also contend that plaintiff's equity skimming cause of action should be dismissed because it is barred by the applicable statute of limitations. The statute provides that actions brought thereunder must be commenced within six years of "the latest date that the Secretary discovers any use of a property's assets and income in violation of the regulatory agreement." 12 U.S.C. § 1715z-4a(d). According to Livecchi, the filing of this action in September 2003 fell outside the limitations period and thus mandates judgment in defendants' favor on the statutory claim.

Assertion of the statute of limitations as a bar to suit is an affirmative defense for which the party asserting it bears the burden of proof.  *See* Fed. R. Civ. P. 8(c); *Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996) (defendants bear burden of establishing affirmative

defense either at trial or on motion for summary judgment).  Here, Livecchi, as the moving party,

bears the burden of demonstrating the absence of any genuine issue of material fact as to his

affirmative defense that the action is barred by the six-year limitations period.  *United States v.*

*Envicon Development Corp.*, 153 F. Supp. 2d 114, 121 (D. Conn. 2001) (on defendants'

summary judgment motion, they bear burden of demonstrating that HUD knew of prohibited use

of project assets or income more than six years before commencing suit); *United States v. Flake*,

783 F. Supp. 762, 766 (E.D.N.Y. 1992) ("defendants have the burden on this motion to show that

the requisite 'discovery' of the prohibited 'use' was made more than six years before the filing of

the complaint").  *Cf. United States v. Retirement Services Group*, 302 F.3d at 430 (in equity

skimming action where HUD moved for summary judgment, and defendants cross-moved on

grounds that action was barred by statute of limitations, defendants bore burden at least to "create

a genuine issue of material fact regarding when HUD had sufficient knowledge to start the

limitations period running").  Moreover, where the party against which the limitations defense is

asserted is the United States, "statutes of limitation sought to be applied . . . must receive a strict

construction in favor of the Government."  *Badaracco v. Commissioner*, 464 U.S. 386, 391

(1984) (quotation omitted).  *See also Westnau Land Corp. v. United States Small Bus. Admin.*, 1

F.3d 112, 115 (2d Cir. 1993).

   I find that defendants have failed to meet their burden.  The government affirms

that it did not receive the Project's financial statements from Livecchi until August 21, 2000

(Docket # 33, Ex. A, ¶ 15), after their production was compelled by HUD, and thus did not

determine prior to that time that defendants had used income from the Project in violation of the

Agreement.  (Docket # 33 at 7).  Such a determination, the government explains, depended upon

HUD's ability to ascertain whether defendants had income from the Project in excess of reasonable expenses for repairs and maintenance.  Although the government maintains that it was unable to make this determination until it had analyzed the financial statements, it points out that the earliest that analysis could have occurred was the date the statements were received, August 21, 2000.  *See United States v. Envicon Development Corp.*, 158 F. Supp. 2d at 121 ("the 'latest date' [in the limitations provision of Section 1715z-4a] . . . mean[s] the date the Secretary receives documentation or other information or notice revealing . . . "'any use of project assets and income in violation of the regulatory agreement'") (quoting 12 U.S.C. § 1715z-4a).  Under this analysis, the government's action was instituted well within the limitations period.

Livecchi has failed to create any genuine issue of material fact as to the government's contention that the action was timely filed.  The only rejoinder Livecchi makes is that HUD knew of Livecchi's failure to make mortgage payments by at least August 1997, when Continental assigned the mortgage to HUD.  (Docket # 30, Memorandum of Law, 27-28).  From this fact, Livecchi contends, HUD also knew that Livecchi was retaining income in excess of reasonable expenses.

I disagree with defendants' reasoning.  Owners of multifamily projects may default on their mortgage payments for any number of different reasons, including that reasonable expenses exceed income.  Such a scenario may develop because sudden, unexpected repairs are required, thus increasing reasonable expenses, or because sudden, unexpected drops in occupancy rates occur, thus decreasing rental income.  Typically, without the financial records to determine the amount of income generated and the reasonable expenses incurred and paid, HUD cannot be expected to discover an owner's misuse of assets or income.

18

Here, Livecchi has alleged no facts to show, or even suggest, that HUD was in possession of documents at the time of the foreclosure disclosing the alleged misuse of Project income; nor has he recounted any communications between HUD and others, whether verbal or written, from which such alleged misuse was apparent.  On this record, I conclude that Livecchi has failed to carry his burden of demonstrating the absence of any genuine issue of material fact that HUD's suit was untimely.  I also find, moreover, that he has failed, in response to the government's summary judgment motion, to raise any genuine issue of material fact concerning the government's credible explanation of why the suit is in fact timely.  Accordingly, I deny defendants' motion for summary judgment on this issue and find that the action is timely.  *See*, *e.g.*, *Envicon Development Corp.*, 153 F. Supp. 2d at 124 ("[on summary judgment motion,] defendants have offered no evidence that proves HUD actually discovered prior to [limitations accrual date] that . . . project funds were improperly distributed[;] [a]s such, the court concludes that there is no genuine issue of material fact that the plaintiff's action was timely-filed"); *United States v. Schlesinger*, 88 F. Supp. 2d at 439 (on summary judgment motion, court found that the government only "discovered" the alleged violations when HUD began auditing the project and thus held that action was timely).  *See also Retirement Services Group*, 302 F.3d at 432 ("'Discovers,' as used in Section 1715z-4a(d), must mean something more than to suspect but something less than to confirm with absolute certainty as to all the possible material details").

**III.   Plaintiff's Motion for Summary Judgment on its Equity Skimming Claim**

The government maintains that it is entitled to summary judgment on its equity skimming cause of action.[5]  According to the government, no genuine issue of material fact exists to dispute that (1) during the period March 1997 through December 1998, the Project was in a non-surplus cash position under the Regulatory Agreement; (2) during that period, income of the Project amounted to $1,084,789; and (3) during that period, reasonable expenses for the repair and maintenance of the Project amounted to $603,351.[6]  (Docket # 24 at 12-21).  Because income exceeded expenses during the period when the Project was in a non-surplus cash position, and because Livecchi retained and used such excess income during that period, he violated the terms of the Regulatory Agreement.  (*Id.* at 12).  That unauthorized retention and use of income, the government continues, constituted a "use" of income that violated the Regulatory Agreement as that term is used in the equity skimming statute, 12 U.S.C. § 1715z-4a(a)(1).  (*Id.* at 11-12).  The government thus maintains that it is entitled to an award of double damages under the statute.  (*Id.* at 21-22; 12 U.S.C. § 1715z-4a(c)).

Livecchi opposes the government's motion on several grounds.  First, he argues that the statute should be interpreted to require an element of scienter and that proof that Livecchi acted with wrongful intent is entirely absent from this record.  (Docket # 30, Memorandum of

---

[5]  The government does not expressly state in its moving papers whether it seeks judgment on its first equity skimming cause of action, which is based upon a calculation of total income over reasonable expenses during the relevant time period, or its second equity skimming cause of action, which is based upon charges improperly expensed to the Project, or both.  Its arguments make clear, however, that its theory of liability is that reflected in the first cause of action, and thus that is the claim this Court addresses.

[6]  This figure was derived by subtracting from the total expenses set forth on the Project's 1997 and 1998 financial statements those expenses Livecchi admitted were not expenses related to the Project.  That amount was then prorated to account for the fact that the relevant period did not include January and February 1997.  (Docket # 24 at 17).  Defendants have not specifically challenged that methodology.

Law, 33).  Second, he disputes – in remarkably conclusory fashion – the government's

calculations of income and expenses during the March 1997 to December 1998 period, and

contends that the relevant period is in any event broader than that.  (*Id.* at 32).  Third, he

challenges the government's interpretation of "use" under the statute and maintains that he did

not in fact misuse any of the income.  (*Id.* at 32).  Finally, he argues that he is entitled to

summary judgment on the government's claim for double damages because "there is absolutely

no evidence to establish the intent required to prove double damages."  (*Id.* at 31).

Livecchi offers no support, and this Court has been unable to find any, for the

proposition that civil liability under 12 U.S.C. § 1715z-4a requires proof of scienter.  Nothing in

the language of the statute suggests, let alone demonstrates, that Congress intended to predicate

liability on a finding of *mens rea*.  By contrast to the civil equity skimming statute, a separate

criminal equity skimming statute exists requiring proof of intent.  *See* 12 U.S.C. § 1715z-19(a)

(criminalizing "willful[]" equity skimming).[7]  I thus reject Livecchi's invitation to read an

element into the statute which I find no indication that Congress intended to require.

As to its calculations of income and expenses during the March 1996 to December

1998 period, the government has submitted an affidavit of Thomas Engloff, a licensed certified

public accountant employed by HUD as a Special Agent, explaining how the figures were

derived.  (Docket # 26, Ex. C).  Engloff affirms that the government's calculations were based

upon Livecchi's own financial statements for the years 1997 and 1998 that he submitted to HUD,

as well as sworn admissions he made during his deposition and stipulations he entered into with

---

[7] Indeed, as stated above, Livecchi was initially prosecuted under the criminal equity skimming statute.
Following dismissal of the indictment on the government's motion, this civil action was commenced.

the government.  (*Id.* at ¶¶ 10-11 and Exs. C-2 through C-4).  Based upon those records and statements, the government credited Livecchi with the income he reported (*compare* Docket # 26, Exs. C-2 and C-3 *with* Docket # 26, Exs. E and I) and allowed the majority of reported expenses.  $187,760 of a total of $787,111 expenses were determined to be unreasonable based on the parties' stipulations and Livecchi's own admissions during his deposition that they did not represent cash expenditures relating to the Project.  (Docket # 26, Exs. C, D and M).  Indeed, according to the government, two expenses – one for a painting expense of $40,000 and the other for a fire damage expense of $30,626 – appear unsubstantiated by any proof, but have nonetheless been accepted by the government as "reasonable."  (Docket # 24 at 13; Docket # 26, Exs. C-3 and M).  Having reviewed Engloff's affidavit and accompanying exhibits, and noting the absence of any proof by Livecchi to dispute Engloff's calculations, I conclude that the government's methodology and calculations are credible.

Rather than offering any specific facts to contradict the government's calculations, Livecchi has simply asserted in conclusory terms that he lacks "the necessary records to demonstrate any additional expenses that [he] could not recall in [his] deposition."  (Docket # 30, Livecchi's Aff., ¶ 48).  He lacks those records as a result of his eviction from the Project's office following the foreclosure sale.  (*Id.*).  Even if that representation were accepted as a justification for his lack of documentation, his failure to offer any details regarding any alleged expenses not accounted for – such as, the time during which the expenses were incurred, the nature of the expenses, the approximate cost of the expense, the identity of any contractor or vendor paid for such expenses – cannot be justified on the same basis.  Moreover, it is not even clear from his affidavit that the additional expenses he believes he may have incurred pertained to the March

1997 through December 1998 period.  On this record, I conclude that Livecchi has not raised a

genuine issue of fact as to the government's calculations of income and reasonable expenses.

   I further reject Livecchi's contention that the relevant period of time for which to

assess income and expenses is broader than March 1997 through December 1998, perhaps

extending as far back as the date on which Livecchi executed the Regulatory Agreement.

Livecchi maintains that "[v]iewed over the life of the project – and not just in the limited March

1997 to December 1998 timeframe . . . – I have paid more money into this project than the

Government now says I skimmed."  (Docket # 30, Livecchi's Aff., ¶ 47).  Even assuming the

veracity of that assertion, the Regulatory Agreement prohibited "mak[ing], or receiv[ing] and

retain[ing], any distribution" of income other than "surplus cash."  (Docket # 26, Ex. N, ¶ 6(e)).

"Surplus cash" was defined to mean cash remaining after payment of, *inter alia*, "[a]ll sums due

or currently required to be paid under the terms of any mortgage or note insured or held by the

Secretary."  (*Id.* at ¶ 13(f)(1)).  To read the Agreement in the fashion Livecchi suggests would

lead to an absurd result.  It would permit a mortgagor to withhold mortgage payments without

penalty even if the mortgagor had sufficient income at the time to make the payments, so long as,

over the life of the Project, the owner had expended more money for reasonable expenses than

the Project had earned.

   Having concluded that the relevant time period is March 1997 through December

1998, I further determine that no genuine issue of fact exists that Livecchi did not make his

required mortgage payments during such period.  Because the Project was in a non-cash surplus

position during that period, the Regulatory Agreement prohibited him from making or retaining

any distribution (defined as the "withdrawal or taking of cash or any assets of the project,

23

including the segregation of cash or assets for subsequent withdrawal") of income, including

rental income, in excess of reasonable expenses. (*See* Docket # 26, Ex. N, ¶¶ 6(e) and 13(g)). I

further conclude that no genuine issue of material fact exists that he did just that: during that time

period, he deposited rental and other income in a total amount of $1,084,789 into a

non-segregated bank account (*see* Docket #30, Livecchi Aff. at ¶ 43), from which he spent

$603,351 on reasonable expenses for the Project.[8] Rather than using the difference to pay his

mortgage payments, as the Agreement required, he either withdrew some of it for non-Project

expenses[9] or left it in the non-segregated account for future use for that or other projects.

The questions remaining are thus: does Livecchi's violation of the Regulatory

Agreement constitute proof of a violation of 12 U.S.C. § 1715z-4a, and, if so, does such statutory

violation entitle the government to double damages as a matter of law. For the following

reasons, I conclude that the answer to the former is yes, and the answer to the latter is no.

Livecchi appears to contest his statutory liability on the grounds that he did not

"use" the restricted income for his personal benefit and thus did not violate the statute. (Docket

# 30, Livecchi Aff., ¶ 45; Docket # 30, Memorandum of Law, 32). Contrary to his contention,

the statute authorizes suit for any use of project assets or income that violates the regulatory

agreement. 12 U.S.C. § 1715z-4a(a)(1). Because, for the reasons discussed above, Livecchi's

---

[8]  In his affidavit, Livecchi explains that he would deposit income from the Cambridge Court project, as well as other projects, into a single bank account, from which he would withdraw funds to pay for maintenance and upkeep of all his properties, as well as other business and personal expenses. (Docket # 30, Livecchi Aff. at ¶¶ 43-44; Docket # 26, Ex. D at 69, 71). This use of a non-segregated account violated the Regulatory Agreement, which provided for the use of a segregated project account. (Docket # 26, Ex. N, ¶ 9(g)).

[9]  To the extent that Livecchi argues that he made year-end accounting adjustments to reflect that the non-Project expenses should not be expensed to the Project (Docket # 30, Livecchi Aff., ¶ 41-49), those accounting adjustments do not alter the fact that he spent funds from this commingled account, into which he had deposited Project income, on non-Project expenses.

use and retention of restricted income violated the Agreement, that violation constituted

permissible grounds for suit under the equity skimming statute.  Nothing in the statute exempts

an owner or operator from liability in the event that the funds were not actually spent for his or

her personal benefit, but rather were spent on Project expenses determined not to be "reasonable"

or other non-Project business expenses.

Finally, both parties urge this Court to determine as a matter of law the

government's entitlement to statutory double damages.  On the one hand, the government

interprets the statute to require the court to award double damages in every case, including this

one, in which a violation is established.  (Docket # 33 at 7-8).  Livecchi, on the other hand,

interprets the statute as conferring discretion on the court to determine whether double damages

are warranted.  Because the record in this case, according to Livecchi, is devoid of any evidence

that he acted with wrongful intent, he argues that this Court should decline to exercise its

discretion to award double damages.  (Docket # 30, Memorandum of Law, 29-31).

Section 1715z-4a(c) provides:

> In any judgment favorable to the United States entered
> under this section, the Attorney General may recover double
> the value of the assets and income of the property that the court
> determines to have been used in violation of the regulatory
> agreement, . . . plus all costs relating to the action, including but
> not limited to reasonable attorney and auditing fees.

12 U.S.C. § 1715z-4a(c).

The government's interpretation of this provision as mandatory, rather than

discretionary, conflicts with the plain language of the statute.  The statute does not use

compulsory language, such as "shall" or "must," but provides that the court "may" award double

damages.  Congress's use of the word "may," coupled with the statute's purpose of "provid[ing]

a greater deterrent to violations," persuaded the First Circuit that the double damages remedy was

not mandatory.  *See United States v. Cofield*, 215 F.3d 171 (1st Cir. 2000) (we "leave to the

informed judgment of the district court the decision whether the award of double damages is just

in the particular circumstances").  *See also United States v. Coleman*, 200 F. Supp. 2d 561, 573

(E.D.N.C. 2002) ("[a]lthough § 1715z-4a permits the recovery of double damages, the decision

whether to award double damages is a matter within the court's discretion").  I find compelling

the First Circuit's reasoning in *Cofield* and conclude that my determination that defendants

violated the equity skimming statute does not automatically entitle the government to double

damages.

      That said, I believe it would be equally inappropriate on the record before me to

determine as a matter of law that Livecchi should not be liable for double damages.  That issue

will be determined after a trial, at which both sides will have the opportunity to offer evidence

relevant to the Court's determination whether double damages should be awarded.  *See Cofield*,

215 F.3d at 171-72 ("[d]ouble damages . . . make sense primarily where the defendant is guilty of

substantial or repeated fault"; "we think that the government is entitled, under the law as we have

clarified it, to an opportunity to persuade the district court that the conduct of the defendants

reflects sufficient fault to warrant double damages"); *United States v. Coleman*, 200 F. Supp. 2d

at 574 (granting summary judgment on equity skimming claim but reserving for trial issues of

double damages and attorneys' fees); *Envicon Development Corp.*, 153 F. Supp. 2d at 128

(granting summary judgment on equity skimming claim but reserving for hearing issue of double

damages); *Schlesigner*, 88 F. Supp. 2d at 452 (granting summary judgment on equity skimming

claim, but concluding that "[w]hether the Government should be awarded double damages . . .

under 12 U.S.C. § 1715z-4a must be determined at trial").


**IV.    Defendants' Affirmative Defenses Do Not Preclude Summary Judgment**

In their Answer, defendants assert various affirmative defenses to the

government's equity skimming cause of action.  (Docket # 30, Thomas Aff., Ex. B, ¶¶ 53-60).  In

its brief in support of its motion for summary judgment, the government has addressed these

defenses and explained why, in its opinion, none precludes judgment in its favor on the equity

skimming claim.  (Docket # 24 at 22-26).  By contrast, other than the defenses of statute of

limitations and failure to state a claim for relief, which are discussed *supra*, defendants have

failed to address any of the remaining affirmative defenses in their motion papers and thus have

not demonstrated the existence of any genuine issue of material fact as to any of the defenses.

On this basis alone, they should not preclude summary judgment.  *See*, *e.g.*, *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial"); *Retirement Services Group*, 302 F.3d at 430

("[s]ummary judgment is properly granted if the record does not contain appropriate summary

judgment evidence which would sustain a finding in the nonmovant's favor on any issue as to

which the nonmovant would bear the burden of proof at trial"); *Bonnie & Co. Fashions, Inc. v.*

*Bankers Trust Co.*, 945 F. Supp. 693, 726 (S.D.N.Y. 1996) (where party moving for summary

judgment addressed affirmative defenses and explained why that they should not preclude

27

summary judgment, and opposing party failed to respond to such arguments, court refused to consider affirmative defenses, finding that opposing party had not satisfied its burden).

In addition, I conclude that even if defendants' silence did not operate as a forfeiture of these affirmative defenses, they are unavailing.  For the reasons already explained, defendants have failed to demonstrate any genuine issue of fact as to the statute of limitations and failure to state a claim defenses, and those affirmative defendants thus do not bar summary judgment.  In addition to these, defendants have asserted three equitable defenses – laches, equitable estoppel and waiver.  The caselaw is abundantly clear that where, as here, these equitable defenses are asserted in an effort to bar the United States from enforcing its legal rights and remedies, the party asserting them bears an extremely heavy burden.  *See*, *e.g.*, *Office of Personnel Management v. Richmond*, 496 U.S. 414, 419, 423 (1990) ("[f]rom our earliest cases, we have recognized that equitable estoppel will not lie against the Government as it lies against private litigants"; "[w]e leave for another day whether an estoppel claim could ever succeed against the Government"); *Heckler v. Community Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60-61 (1984) ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the law is undermined.  It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant."); *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 278 (2d Cir. 2005) ("the United States has traditionally not been subject to the defense of laches"); *United States v. RePass*, 688 F.2d 154, 158 (2d Cir. 1982) (waiver cannot be inferred against the government from its decision not to pursue a legal claim in a different forum).  Moreover, this Court's research has disclosed no reported decisions in which one of these

equitable defenses was held to bar judgment for HUD on an equitable skimming claim.  Indeed, in one equity skimming action in which the court refused to find that the government was estopped from pursuing its claim, the court noted, "[e]stoppel would be particularly inappropriate to allow expenditures of public funds that are not authorized by statute." *United States v. Flake*, 783 F. Supp. at 765.

   With respect to the relationship of these equitable defenses to this case, I find no evidence of any improper delay, giving rise to a laches defense.  Following HUD's receipt in August 2000 of Livecchi's 1997 and 1998 financial statements, a criminal equity skimming action was initiated against him less than two years later, in March 2002.  When that suit was dismissed, this civil action was instituted four months later.  Neither the nineteen-month lapse between HUD's receipt of the financial statements and the government's criminal action, nor the thirty-seven month lapse between the receipt of the financial statements and this action can be viewed as so unreasonable as to bar the government's suit under the equitable doctrine of laches.

   Equally unavailing are the affirmative defenses of estoppel and waiver.  Both claims are asserted in wholly conclusory fashion in the answer and include no facts upon which such defenses are purportedly predicated.  With respect to the estoppel defense, Livecchi has not identified any alleged misrepresentations by HUD officials on which Livecchi purportedly reasonably relied to his detriment.  *See City of New York v. Shalala*, 34 F.3d 1161, 1168 (2d Cir. 1994) (estoppel against government is applied "only in those limited cases where the party can establish both that the Government made a misrepresentation upon which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct").  To the extent that Livecchi may contend that he interpreted the representations in the Regulatory

29

Agreement to obligate HUD to pay all his RFR requests, the reasonableness of any such reliance

on this alleged representation is belied by the Agreement itself (providing that disbursements

from the RFR require the written consent of the HUD Secretary) and a subsequent settlement

agreement he entered into with HUD (providing that nothing in the settlement agreement

"required HUD to approve the RFR requests").  (Docket # 38, Ex. A, ¶ 2).  Similarly, with

respect to the waiver defense, Livecchi has not articulated any conduct or statements by HUD

evidencing HUD's alleged intent to relinquish its right to seek relief against Livecchi for equity

skimming.  *See United States v. RePass*, 688 F.2d at 158 (waiver constitutes the intentional

relinquishment of a known right).

> With respect to the defense that C.R.L. is improperly named and claims against it
are barred, the record is devoid of any evidence to support such a defense.  As both parties agree,
C.R.L. was the managing agent for the Project, and, as such, liability against it may be sought
under 12 U.S.C. § 1715z-4a.  *See*, *e.g.*, 12 U.S.C. § 1715z-4a(2) ("person" against whom suit
may be brought "mean[s] any person or entity that owns or operates a property"); *Envicon
Development Corp.*, 153 F. Supp. 2d at 127 (summary judgment granted on government's claim
under § 1715z-4a against project's property manager).

> Finally, it is unclear to this Court how the asserted affirmative defense of failure
to mitigate damages applies in this case.  The claim brought by the government is not for breach
of Livecchi's mortgage agreement; rather, it is for Livecchi's improper use of project income at a
time when he was in default on the mortgage.  To the extent that he argues that the government
violated its implied obligation of fair dealing and good faith, and that such violation prevented
Livecchi from resolving the default, that argument is more appropriately addressed in defendants'

counterclaim for recoupment, which, as discussed below, may proceed.  Accordingly, I conclude that none of the affirmative defenses asserted in defendants' Answer bar an award of summary judgment against them under 12 U.S.C. § 1715z-4a.

In sum, this Court concludes that the government should be awarded summary judgment on its first cause of action.  I further find that the government has established that the defendants used $481,438 of Project income in violation of the Regulatory Agreement and the equity skimming statute, 12 U.S.C. § 1715z-4a.  Whether that amount should be doubled or reduced as a result of any recoupment, and whether and in what amounts costs, attorneys' fees and auditing fees should be awarded, are determinations that should await a trial.

## V.   Defendants' Motion to Add a Counterclaim for Recoupment

Defendants move for leave to amend the Answer to add a counterclaim for recoupment.  According to defendants, they are entitled to recoupment on two grounds: first, that HUD violated the Regulatory Agreement; and, second, that HUD violated the Federal Tort Claims Act.  (Docket # 30).  The government opposes the motion to amend on the grounds of undue delay, undue prejudice and futility.  (Docket # 33).

Rule 15(a) of the Federal Rules of Civil Procedure provides that once the time for amending a pleading as of right has expired, a party may request leave of the court to amend, which "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  If the underlying facts or circumstances relied upon by the party seeking leave to amend may be a proper subject of relief, the party should be afforded the opportunity to test the claim on its merits.  *See United States ex rel. Maritime Admin. v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 889

F.2d 1248, 1254 (2d Cir. 1989).  "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'"  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

While the court retains discretion to grant or deny leave to amend under Rule 15(a), "[the] outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules."  *Id.* at 182; *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *Evans v. Syracuse City School Dist.*, 704 F.2d 44, 46 (2d Cir. 1983).

In evaluating a motion to amend, the court should carefully consider whether the non-moving party will be prejudiced by such amendment.  According to the Second Circuit, a court must consider "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."  *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993) (citations omitted).

"One of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action."  *Krumme v. WestPoint Stevens Inc.,* 143 F.3d 71, 88 (2d Cir.), *cert. denied*, 525 U.S. 1041 (1998) (internal quotation omitted).  Mere delay, however, unaccompanied by either bad faith or undue

prejudice, does not warrant denial of leave to amend.  *Block v. First Blood Associates*, 988 F.2d

at 350 (citing *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)).

Under the original scheduling order in this case, all motions to join additional

parties and to amend the pleadings were to have been filed by February 9, 2004.  (Docket # 7).

While other deadlines in the scheduling order subsequently were amended, that deadline was not.

Thus, because Livecchi's pending motion, filed on March 17, 2005, was not filed until over

thirteen months after the filing deadline, the government argues that the "delay" factor counsels

strongly against amendment at this date.

Despite such assertions, the government has failed to provide any evidence that it

would suffer undue prejudice should Livecchi's amendment be permitted.  Indeed, during oral

argument, the government conceded that no additional discovery would be required should this

claim proceed.  The apparent reason that no additional discovery would be necessary is that the

factual basis for the recoupment counterclaim is the same factual basis for several of defendants'

affirmative defenses and pending counterclaims.  On this record, this Court can conceive of no

undue prejudice from which the government may suffer.  *See Rachman Bag Co. v. Liberty Mut.*

*Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995) (leave to amend answer granted four years after initial

filing of complaint was not unreasonable because plaintiff failed to demonstrate undue

prejudice)*; State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d at 856 (allowing amendment

three years after filing of initial pleading based upon finding that delay did not cause undue

prejudice).

Having determined that Livecchi's motion will not cause undue delay, this Court

must now consider the government's claim that the recoupment claim sought to be included is

futile.  It is well-settled that if the amendment proposed by the moving party is futile, "it is not an abuse of discretion to deny leave to amend."  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d at 131. The determination whether a proposed amendment is futile is made under the same standard as that used to consider whether a claim would be subject to a motion to dismiss.  *See Hampton Bays Connections, Inc. v. Duffy*, 212 F.R.D. 119, 123 (E.D.N.Y. 2003) (citing *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 160 F. Supp. 2d 657, 666 (S.D.N.Y. 2001)).  Thus, the court "must view the claim in the light most favorable to the moving party and determine whether there is a colorable claim for relief."  *Santiago v. Steinhart*, 1993 WL 410402, *2 (S.D.N.Y. 1993).

The doctrine of sovereign immunity generally bars claims and counterclaims against the United States, even those arising from the same transaction as the government's claim, unless there exists specific congressional authorization for suit.  *United States v. Forma*, 42 F.3d 759, 764 (2d Cir. 1994).  Despite sovereign immunity, however, a defendant in an action asserted by the government may file a counterclaim for recoupment seeking recovery of an amount up to the principal amount claimed by the United States.  *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 511 (1940); *United States v. Forma*, 42 F.3d at 764. Thus, the counterclaim for recoupment may "defeat or diminish the sovereign's recovery." *Forma*, 42 F.3d at 764 (quoting *United States v. Agnew*, 423 F.2d 513, 514 (9th Cir. 1970)); *see United States v. Green*, 33 F. Supp. 2d 203, 223 (W.D.N.Y. 1998) ("if recoupment applies, no independent waiver of sovereign immunity is required").  The government does not argue to the contrary.

Courts have generally treated claims for recoupment as compulsory counterclaims under Rule 13 of the Federal Rules of Civil Procedure. *See, e.g., Hatzel & Buehler, Inc. v. Louisa Const. Co., Inc.*, 1993 WL 276971, *5 (E.D.N.Y. 1993) (finding defendants' claim to be analogous to claim for recoupment, and "[a]s such, it is a compulsory counterclaim"); *F.D.I.C. v. F.S.S.S.*, 829 F. Supp. 317, 322 (D. Alaska 1993) ("claims for recoupment are compulsory counterclaims under Fed. R. Civ. P. 13(a)"); *Hunt v. Bankers Trust Co.*, 689 F. Supp. 666, 672 (N.D. Tex. 1987) ("[r]ecoupment is a demand arising out of the same transaction as the plaintiff's claim"). As compulsory counterclaims, the relevant inquiry is whether there is a "logical relationship" that exists between the claim and the counterclaim, *United States v. Heyward-Robinson Co.*, 430 F.2d 1077, 1081 (2d Cir.), *cert. denied*, 400 U.S. 1021 (1970), such that the two claims are "inextricably intertwined." *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1071 (2d Cir.), *cert. denied*, 434 U.S. 1035 (1977); *see United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1980) (court must determine whether there is a logical relationship between claim and counterclaim and whether the essential facts are "so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit") (quoting *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978)).

In order to raise a valid claim for recoupment, the claim must arise out of the same contract or transaction upon which the government's claim is based and seek only a defensive setoff, as opposed to an affirmative recovery. *Forma*, 42 F.3d at 765; *United States v. Green*, 33 F. Supp. 2d at 223. Here, as previously stated, Livecchi's claim for recoupment is based upon two separate grounds. Livecchi first argues that HUD violated the explicit terms of the Regulatory Agreement and its implied covenant of good faith and fair dealing in administering

35

the HUD-insured mortgage.  (Docket # 30, Thomas Aff., Ex. C).  This claim arises out of the events that form the basis for the government's equity skimming claim – the parties' agreement that HUD would insure Livecchi's mortgage in return for Livecchi's agreement to restrictions governing his operation of the Project.  Moreover, through his counterclaim, Livecchi seeks monetary relief, not as an affirmative recovery, but as a setoff to reduce the amount ultimately recoverable by the government.  Finally, as the government apparently concedes, the Tucker Act (28 U.S.C. § 1346) provides an independent jurisdictional basis for the counterclaim.[10]  *See Forma*, 42 F.3d at 765 ("it has long been absolutely clear that the exception does not permit any affirmative recovery against the United States on a counterclaim that lacks an independent jurisdictional basis").  Thus, Livecchi has satisfied the requirements for establishing a recoupment claim relating to an alleged violation of the Agreement's implied covenant of good faith and fair dealing.

As his second basis for recoupment, Livecchi argues that HUD committed violations of the Federal Tort Claims Act.  According to Livecchi, HUD tortiously deprived him of his property through the negligent performance of its duties in administering the RFR and by failing to pursue a workout agreement with him.  As with the first recoupment claim, this claim also relies upon the same events forming the basis of the government's claim and seeks merely a setoff of the amount ultimately recoverable.

---

[10]  Although the Tucker Act vests jurisdiction over contract claims against the United States in the Federal Court of Claims, such claims may be heard in federal courts when they are asserted as recoupment counterclaims limited to the right to a setoff against any recovery by the United States.  *Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 617-18 (W.D. Wis. 1995).  *See also Presidential Gardens Assoc. v. United States*, 175 F.3d 132, 141 (2d Cir. 1999) ("Tucker Act jurisdiction is often thought to be exclusive.  However, contract claims against the United States may be asserted in U.S. district courts if there is an independent waiver of sovereign immunity outside the Tucker Act.").

Although, as stated below, Livecchi may no longer seek an affirmative recovery under the Federal Tort Claims Act due to the expiration of the applicable statute of limitations, counterclaims for recoupment are not subject to a statute of limitations defense. *Reiter v. Cooper*, 507 U.S. 258, 264 (1993) (statute of limitations does not apply to counterclaim for recoupment) (citing *Bull v. United States*, 295 U.S. 247, 262 (1935)).  Moreover, for the reasons already discussed, because the Federal Tort Claims Act provides an independent jurisdictional basis, a recoupment claim on this basis is not subject to the defense of sovereign immunity.  *See United States v. United Fidelity & Guaranty Co.*, 309 U.S. at 511; *Forma*, 42 F.3d at 764.[11]

Viewing the allegations in a light most favorable to defendants, I conclude on the record before me that the defendants' claim for recoupment, sounding both in contract and tort, states a colorable claim for relief.  *See Santiago v. Steinhart*, 1993 WL 410402, *2 (S.D.N.Y. 1993).  While certain of the allegations supporting their claim appear speculative (such as the claim that Livecchi was damaged by HUD's original decision, later rescinded, to increase the RFR funding requirements), others may provide a grounds for relief.  For example, the record appears to demonstrate that two RFR requests made in late 1996 and early 1997 were denied, but it is unclear whether the amounts of those request were fully credited to Livecchi at the time of the foreclosure sale.  Livecchi claims that he has never been provided with a full and adequate accounting of the funds in the RFR at the time he defaulted.  Although the government may be able to refute this claim at trial, the record before me on these motions does not.

---

[11]  To the extent Livecchi seeks to amend his Answer to include a counterclaim for recoupment based upon a violation of his Fifth Amendment right to due process, such claim is denied.  As discussed below, neither the United States, nor its agencies, may be held liable for the violation of a claimant's constitutional rights.  Thus, there is no jurisdictional basis for such a recoupment claim.

In addition, I find that Livecchi has raised colorable claims about HUD's actions in the period following Continental's assignment to it of the mortgage as to which genuine issues of material fact exist. These disputes preclude me from determining that defendants' recoupment counterclaim would be futile. Accordingly, I grant defendants' motion to add a counterclaim for recoupment.

VI.    **Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims**

The government moves for summary judgment on the pending counterclaims, other than recoupment. Specifically, the government argues that judgment should be awarded in its favor on Livecchi's claims that (1) HUD violated the Administrative Procedures Act (First Counterclaim); (2) HUD violated his Fifth Amendment rights (Second Counterclaim); and (3) HUD is liable under the Federal Tort Claims Act (Third Counterclaim). At oral argument, Livecchi conceded that the Federal Tort Claims Act cause of action was barred by the statute of limitations. Accordingly, I grant the government's motion for summary judgment dismissing the third counterclaim insofar as it seeks affirmative relief of damages in excess of the government's recovery on its equity skimming claim.[12]

A.    **Administrative Procedures Act Counterclaim**:  Livecchi claims that HUD violated the Administrative Procedures Act by improperly administering the HUD-insured loan. (Docket # 2 at ¶ 81). As a result of HUD's actions, Livecchi alleges to have "suffer[ed] the loss of property, including certain personal and business possessions therein, and all amounts retained

---

[12]  For the reasons set forth in the previous section, the Federal Tort Claims Act counterclaim may proceed as a recoupment claim limited to a set-off against the government's recovery.

and wrongly converted by HUD in the RFR."  (Docket # 2 at ¶ 81).  In relief, Livecchi seeks the

return of all property wrongfully taken, including "all funds retained as part of the [RFR]."

(Docket # 2 at ¶ 87).

The Administrative Procedure Act ("APA"), 5 U.S.C. § 702,  governs equitable

claims asserted against the United States and provides that "an action seeking relief other than

money damages and stating a claim that an agency acted or failed to act in an official capacity

shall not be dismissed on the ground that the suit is against the United States."  *Presidential*

*Gardens Assoc. v. United States*, 175 F.3d at 143 (quoting *Dickson v. Pierce*, 1988 WL 26107,

*2 (E.D.N.Y. 1988)).  Thus, the APA creates a general waiver of sovereign immunity for

equitable claims.  Notwithstanding that waiver, the APA specifically provides that it does not

confer authority to grant relief "if any other statute that grants consent to suit expressly or

impliedly forbids the relief which is sought."  5 U.S.C. § 702; *see Presidential Gardens Assoc.*,

175 F.3d at 143.

Relevant to this case, the Tucker Act "impliedly forbids" relief for claims arising

out of a contract with the United States other than the remedy provided in that statute.[13]

*Presidential Gardens Assoc.*, 175 F.3d at 143 (citing *Estate of Watson v. Blumenthal*, 586 F.2d

925, 933-34 (2d Cir. 1978)).  Specifically barred is "any injunctive, mandatory or declaratory

relief against government officials when the result would be the equivalent of obtaining of money

---

[13]  Pursuant to the Tucker Act, Livecchi could have brought a claim in the Federal Court of Claims because (1) the action would have been against the United States, (2) the action would have sought monetary relief exceeding $10,000, and (3) the action would have been founded upon, among other things, a government contract.  28 U.S.C. §§ 1346(a)(2) and 1491 (2004).  *See Presidential Gardens Assoc.*, 175 F.3d at 143; *see also Reynolds Assocs. v. United States*, 31 Fed. Cl. 335 (1994) (finding that Court of Federal Claims had jurisdiction over case in which owner of property insured by HUD filed suit for damages exceeding $10,000 because HUD failed to timely process rent increase request).

damages." *Id.* (quoting *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727 (2d Cir. 1983)).

Simply stated, equitable claims cannot be brought under the APA in an effort to obtain money

from the government. *Id.*

   Here, Livecchi seeks the return of his property, including funds that were retained

as part of the RFR. As Livecchi recognizes, however, foreclosure of the property has already

occurred, and the property is now owned by a third party. Thus, the only meaningful relief

sought by Livecchi is monetary compensation. "Actions seeking specific performance of a

contract, brought in order to avoid the Tucker Act's limitation on money judgments, are not

allowed to be brought against the United States." *Id.* (citing *B.K. Instrument, Inc. v. United

States*, 715 F.2d at 728). Accordingly, Livecchi's counterclaim brought pursuant to the APA

must be dismissed as it only seeks monetary damages, and the government's summary judgment

motion as to that counterclaim is granted.

   **B.  Due Process Counterclaim:**  In his second counterclaim, Livecchi contends

that HUD deprived him of his property in violation of his Fifth Amendment right to due process.

As above, Livecchi asserts that money damages are the appropriate remedy. (Docket # 2 at

¶¶ 83, 85). Livecchi's claim, however, must be dismissed because the United States and its

agencies cannot be held liable for damages based upon an alleged violation of a claimant's

constitutional rights.

   In *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471 (1994), the Supreme Court

addressed a claimant's Fifth Amendment Due Process claim filed against the FDIC. Finding first

that the constitutional claim was not cognizable under the Federal Tort Claims Act, the Supreme

Court proceeded to articulate a two-part inquiry for determining whether such claim could be

brought against a federal agency: first, whether there had been a waiver of sovereign immunity;

and, second, if so, whether the source of substantive law upon which the claimant relied provided

an avenue for relief. *Id.* at 484. The Court concluded that claims for damages based upon

constitutional torts could not be brought against a governmental agency. *Id.*

Here, as in *Federal Deposit Ins. Corp. v. Meyer*, nothing in the National Housing

Act suggests that Congress intended HUD to be liable for money damages for constitutional

violations. *See United States v. West Street Assoc. Ltd. P'ship*, 1998 WL 34193430, *9 (D.

Conn. 1998) (dismissing counterclaim in equity skimming action for violation of due process on

grounds that defendants failed to demonstrate waiver of sovereign immunity). *See also Weisberg

v. Leon*, 1999 WL 1216663, *2 (S.D.N.Y. 1999) (dismissing due process claim against HUD

seeking monetary relief for actions taken to address housing discrimination complaint because

FHA implied no private right of action). Based upon such authority, I find that the government is

entitled to summary judgment on Livecchi's second counterclaim.


## CONCLUSION

For the foregoing reasons, it is my Decision and Order that plaintiff's motion for

summary judgment on its equity skimming claim (the first cause of action) (**Docket # 23**) is

**GRANTED**; plaintiff's motion for summary judgment on each of defendants' counterclaims in

its original Answer (First, Second and Third Counterclaims) (**Docket # 23)** is **GRANTED**;

defendants' cross-motion for summary judgment (**Docket # 30**) is **DENIED**; and, defendants'

cross-motion to add a counterclaim for recoupment (**Docket # 30**) is **GRANTED**. Counsel for

the parties shall contact this Court within fourteen (14) days of this Order to schedule a pretrial

conference.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
                    MARIAN W. PAYSON
                    United States Magistrate Judge

Dated:  Rochester, New York
          September   30  , 2005.