UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

CHARLES R. LIVECCHI and
C.R.L. MANAGEMENT, INC.,

                Defendants.

─────────────────────────────

<u>DECISION & ORDER</u>

03-CV-6451P

        The United States has brought suit against Charles Livecchi ("Livecchi") and his real estate management company, C.R.L. Management, Inc. ("CRL"), under 12 U.S.C. § 1715z-4a(a)(1)(B). Under that statute, the federal government may sue any owner or operator of a multifamily project financed through a mortgage insured by the United States Department of Housing and Urban Development ("HUD") "to recover any assets or income used . . . in violation of a regulatory agreement that applies to [such] project." 12 U.S.C. § 1715z-4a(a)(1)(B). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a magistrate judge.

        From 1992 through 1998, Livecchi owned and, together with CRL, managed a multifamily project known as Cambridge Court Apartments (the "Project") that was financed through a HUD-insured mortgage. The Project was located on Dodge Street in Rochester, New York (the "Property"). In return for HUD's agreement to insure Livecchi's mortgage, Livecchi executed a regulatory agreement with HUD, dated August 20, 1992, (the "Regulatory Agreement" or "Agreement") governing the operation of the Project. In November 1998, HUD

foreclosed on the Property due to Livecchi's failure to make the required mortgage payments, and it was sold to a third party. Five years later, in 2003, the United States initiated this civil action against defendants under 12 U.S.C. § 1715z-4a(a)(1)(B).

Summary judgment has already been awarded to the government on its statutory claim. By Decision and Order dated September 30, 2005, this Court determined that Livecchi had retained income in the amount of $481,438 in violation of the Regulatory Agreement during the period of Livecchi's mortgage default (March 1997 through December 1998). (Docket # 40). As explained more fully in that decision, familiarity with which is assumed, the Court concluded that Livecchi's retention of that income constituted a violation of 12 U.S.C. § 1715z-4a(a)(1)(B). The Court reserved decision on the government's application for double damages under the statute. The Court also dismissed defendants' then pending counterclaims, but granted defendants' motion to add counterclaims for recoupment.

A bench trial was thereafter conducted limited to the following issues: (1) whether the United States should be awarded double damages under 12 U.S.C. § 1715z-4a(c); (2) whether the United States should be awarded prejudgment interest and, if so, what methodology should be utilized to calculate it; and (3) whether Livecchi has proved his counterclaim of recoupment, thus entitling him to a reduction in the amount of the judgment. At trial, the government called two witnesses: Rosalinda Lamberty, the Director of Multifamily Housing for HUD's Buffalo Regional Office, and Thomas Egloff, formerly employed by HUD's

Office of Inspector General as an agent and auditor. The defense called Livecchi as its sole witness.[1]

The following constitutes this Court's decision on the pending issues.

## FACTUAL BACKGROUND

### A. Livecchi's HUD-Insured Mortgage and the Parties' Regulatory Agreement

Livecchi purchased the Property in 1982 and refinanced it in 1992 by obtaining a HUD-insured mortgage from Continental Securities Corporation ("Continental") in the amount of $2,390,000. (Docket # 40 at 2). At the time of the refinancing, Livecchi had approximately $700,000 of equity in the Property. (Tr. 409).[2] In consideration for HUD's agreement to insure the mortgage and relieve Livecchi of any personal liability in the event of a mortgage default, Livecchi signed the Regulatory Agreement with HUD.[3] (Docket # 40 at 2-3).

The Agreement obligated Livecchi, *inter alia*, to make "all payments due under the note and mortgage," to establish and maintain a capital reserve fund and to provide HUD

---

[1] At trial, Livecchi represented himself *pro se*, but was assisted by counsel for CRL. Livecchi has joined in counsel's post-trial submissions. (Docket ## 98, 98-2).

[2] "Tr." refers to the transcript of the trial conducted on September 18 through 22, 2006.

[3] Specifically, paragraph 17 of the Regulatory Agreement provided that Livecchi did not assume personal liability for payments due under the note and mortgage or to the reserve for replacement fund (discussed *infra*). He remained liable only:

> (a) for funds or property of the project coming into [his] hands which, by the provisions hereof, [he is] not entitled to retain; and

> (b) for [his] own acts and deeds or acts and deed of others which [he] ha[s] authorized in violation of the provisions hereof.

(Government Exhibit ("G. Ex.") 4 at ¶ 17).

3

with annual financial statements "prepared in accordance with the requirements of [HUD]." (G. Ex. 4 at ¶¶ 1, 2, 9(e)). The Agreement also restricted Livecchi's use of income derived from the Property by prohibiting him from retaining any rental income in excess of reasonable operating and maintenance expenses during any period in which the mortgage was in arrears. (G. Ex. 4; Docket # 40 at 3). By the terms of the Agreement, any violation by the owner of his obligations thereunder authorized HUD to declare a default under the Agreement, accelerate the loan and proceed to foreclosure of the Property. (G. Ex. 4 at ¶ 11(a); Tr. 42-43).

The capital reserve fund, which was referred to in the Agreement as the "reserve fund for replacements" (the "RFR"), functioned as an escrow account from which payments could be made for replacement of capital components of the property. (Docket # 40 at 3). Director Lamberty ("Lamberty") testified that the purpose of the RFR was to ensure that sufficient funds were available to finance capital replacements for the Project, thus protecting the condition of the Property for its residents. (Tr. 26-27). The Agreement required Livecchi to fund the RFR with an initial deposit of $200,000, and thereafter to make monthly payments of $2,013 into the fund.[4] (G. Ex. 4 at ¶ 2; Docket # 40 at 3). According to the terms of the Agreement:

> Disbursements from the [RFR], whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary [of HUD].[5]

---

[4] Trial testimony established that although the requirements for the fund's balance fluctuated during the period of the mortgage, the monthly deposit requirement never changed from $2,013. (Tr. 125, 517).

[5] Lamberty testified that the Secretary of HUD delegated to each HUD Regional Director of Multifamily Housing, including her, the authority to consent to RFR payments. (Tr. 182).

(G. Ex. 4 at ¶ 2). The Agreement further provided that in the event of a mortgage default for which the loan was accelerated, HUD was authorized to apply the balance in the RFR to reduce the amount of the mortgage indebtedness. (*Id.*).

### B. The Disputes that Led to the Parties' September 1994 Settlement Agreement

Within several months of their execution of the Regulatory Agreement, the parties began to dispute their obligations thereunder. Those disputes related principally to Livecchi's obligation to provide HUD with annual financial statements relating to the Property and HUD's obligation to reimburse Livecchi from the RFR for capital expenditures relating to the Property. (G. Exs. 6, 7, 8, 48, 62; Defendants' Exhibits ("D. Exs.") C, E). As to the former, HUD maintained that Livecchi was required by HUD policy to provide accrual-based, rather than cash-based, financial statements; Livecchi contended that the Regulatory Agreement contained no requirement as to the form of the statements. As to the latter, HUD refused to release funds from the RFR to reimburse Livecchi for his expenditures until he submitted accrual-based statements; Livecchi objected to HUD's withholding of RFR payments on that basis. (Tr. 49-50).

These disputes eventually culminated in a 1994 administrative proceeding by HUD seeking to impose sanctions against Livecchi in the form of a "Limited Denial of Participation" ("LDP"). (G. Ex. 49). Specifically, HUD sought to prohibit Livecchi from conducting any new business with HUD for a twelve-month period. (Tr. 57-61, 415-18; G. Exs. 10, 11). Livecchi opposed HUD's application for the LDP, and the matter was assigned to an administrative law judge for determination. Prior to a hearing, the parties reached a resolution,

which was memorialized in a written settlement agreement executed on or about September 12, 1994 (the "Settlement Agreement").  (G. Ex. 12; Tr. 61-64, 418-19).

Pursuant to the terms of the Settlement Agreement, Livecchi agreed "to comply fully with all rules, regulations and other requirements of HUD, and specifically with respect to HUD's requirement of accrual based financial statements."  (G. Ex. 12 at ¶ 1; Tr. 62).  Livecchi further agreed to provide accrual-based statements for the year 1994 on or before March 1, 1995. (G. Ex. 12 at ¶ 1; Tr. 63).  HUD, in turn, agreed to "process" within ten days of the Agreement all of Livecchi's currently outstanding requests for reimbursement from the RFR.  (G. Ex. 12 at ¶ 2).  By the express terms of the Agreement, HUD did not agree "to approve" such requests "unless in HUD's sole determination [Livecchi] has satisfied HUD's requirements for such approval."  (*Id.*).  The final provision of the Agreement stated, "HUD shall have the exclusive right to determine [Livecchi's] compliance with HUD's rules, regulations and requirements." (G. Ex. 12 at ¶ 6; Tr. 64).


C.  **The Parties' Continued Disputes Following the Settlement Agreement**

Nine days after the execution of the Settlement Agreement, HUD approved a release to Livecchi from the RFR in the amount of $48,755.25.  (G. Ex. 13; Tr. 65).  That amount represented the full amount of Livecchi's outstanding RFR requests, minus $161.22 for items that HUD determined were normal operating expenses, and adjusted to account for duplicate requests.  (G. Exs. 13, 13a, 14; Tr. 66).

In November 1994, Livecchi made his next request for reimbursement from the RFR, this time in the amount of $28,096.27.  (G. Ex. 51; Tr. 143).  Later that month, HUD

approved a release from the RFR in the amount of $27,609.22. (G. Ex. 52; Tr. 143-45). The

majority of the $487 disallowance related to a key machine purchased by Livecchi for $371.25.[6]

(G. Ex. 52; Tr. 145). Livecchi requested HUD to reconsider the disallowance for the key

machine. (G. Ex. 16; Tr. 145). Approximately three weeks later, HUD wrote to Livecchi

reaffirming the disallowance, noting that "[t]he key machine is not a legitimate replacement

item" and enclosing a HUD form listing items for which RFR reimbursement was permitted.

(G. Ex. 17; Tr. 145, 523).

    Not satisfied with HUD's decision concerning the key machine, Livecchi wrote to

HUD "demanding" the release of the funds within ten days and threatening to "commence legal

action against HUD" in the event of HUD's refusal. (G. Ex. 53; Tr. 146-47). Approximately ten

days later, Livecchi wrote to the administrative law judge to whom the 1994 LDP proceeding had

been assigned and requested that the proceeding be restored to the judge's calendar. (G. Ex. 54;

Tr. 420). In his letter to the judge, Livecchi complained that HUD's refusal to pay the full

amount of all of his RFR requests constituted a breach of the Settlement Agreement. He stated,

"[d]ue to [HUD's] breach of contract, I do not feel responsible to provide the accounting we had

agreed upon, and will not do so." (*Id.*). In response, Livecchi received a letter advising him that

the administrative proceeding had been closed. (D. Ex. K; Tr. 420).

    At the end of February 1995, Livecchi submitted another request for release of

RFR funds. This request was in the amount of $16,684.36. (G. Ex. 55; Tr. 422). By letter dated

March 20, 1995, HUD denied the request, citing two reasons. (G. Ex. 18). The first was

---

[6] The remainder, $115.80, related to invoices for lighting fixtures and faucet equipment that HUD considered normal operating expenses. (G. Ex. 52).

Livecchi's failure to provide a capital needs budget. The letter explained that a capital needs budget was "necessary to determine what a sufficient reserve balance and monthly deposit would be to meet the future capital needs of the property." (*Id.*). The second reason cited was Livecchi's failure to have submitted audited statements in accrual-based format for the year 1994. The letter noted that a thirty-day extension had been granted until March 31, 1995 for the submission of the statements. HUD advised Livecchi, "[w]e need to be certain that the financial statement is in the correct format before we approve any further releases" and assured him, "[o]nce the matters stated above have been resolved, we will review the request for reimbursement from the replacement reserve account." (*Id.*).

The same two reasons were cited by HUD six months later when Livecchi submitted his next request for release of funds from the RFR. (G. Ex. 19). Specifically, on August 21, 1995, Livecchi submitted a request for release in the amount of $15,958.27. (G. Ex. 57). As in March, HUD denied the request in writing and reiterated its refusal to make payments from the fund in the absence of a capital needs budget and financial statements for 1994. (G. Ex. 19; Tr. 153-56, 172).

Livecchi responded to this denial by writing Lamberty, who then served as Asset Management Chief for the Buffalo office, to complain that HUD was unjustly withholding reimbursement from the RFR. (D. Ex. Q). In the letter, Livecchi inquired about a process for appealing the decision; if none existed, the letter continued, Livecchi would "commence legal action in the Federal Courts to sue HUD for abuse of power and breach of the regulatory agreement and hold HUD liable for all of [his] losses . . . and sue for the balance of mortgage for breach of contract." (*Id.*).

8

On October 5, 1995, Lamberty wrote to Livecchi in response to his letter. (G. Ex. 20). She advised Livecchi that while there was no formal appeal process, the Buffalo HUD office "would be more than willing" to have a meeting with him "to discuss the situation." (*Id.*). The letter reiterated that Livecchi's RFR requests had been denied based upon his failure to submit the capital needs budget and the still outstanding 1994 audited financial statements. (*Id.*). The letter noted that an extension had been granted for submission of the 1994 statements only until April 15, 1995. (*Id.*).

Livecchi testified at trial that he believed the 1994 financial statements had in fact been submitted by no later than September 1995. (Tr. 589, 597). This testimony is not supported, however, by the documentary evidence admitted at trial. On August 14, 1995, HUD issued Livecchi a formal notice that the financial statements had not been submitted and that such failure could subject him to sanctions, including civil money penalties. (D. Ex. N). Livecchi responded to the notice by letter dated August 22, 1995, "to explain what had been going on with HUD," namely, his unsuccessful requests for release of funds from the RFR. (D. Ex. O). Specifically, Livecchi stated:

> First, to let you know that the financial statements are completed for this complex. I asked my accountant not to mail the financial statements because of the difficulties that I am having with the Buffalo HUD office, with hopes that the Buffalo HUD office would put me in a limited denial participation, so that, this would put me before the Administrative Law Judge. . . .
>
> I feel that if I did not give Buffalo [HUD] my financial statements, I would be able to start a new action with them after they put me in the limited denial of participation.

(D. Ex. O; Tr. 424, 597). The subsequent letter by HUD to Livecchi in October 1995 stated that HUD still had not received the 1994 financial statements. (G. Ex. 20; Tr. 590).

Contrary to Livecchi's testimony that the 1994 financial statements were submitted to HUD by September 1995, I find that they were submitted at some point between October 1995 and January 1996. (D. Ex. T; Tr. 430-33). In January 1996, Livecchi also submitted a ten-year budget. In the cover letter to HUD accompanying that submission, Livecchi noted that "you should now have everything that you requested to release the money from the RFR." (D. Ex. U; Tr. 434-35).

Approximately two weeks later, HUD released funds from the RFR in the amount of $33,154.38, covering three pending requests by Livecchi in the aggregate amount of $38,351.80 – the February and August 1995 requests and a subsequent November 1995 request. (G. Ex. 59; Tr. 438). The amount disallowed represented the costs of items that HUD considered normal maintenance items or were not listed in Livecchi's capital needs budget. (G. Ex. 59). HUD identified the disallowed items in its explanatory letter to Livecchi. The letter further informed Livecchi that HUD could not accept his capital needs budget because it was incomplete and based upon unrealistic projections and historical expenses. (*Id.*).

On November 18, 1996, Livecchi submitted a final RFR request in the amount of $20,711.53. (G. Ex. 60; Tr. 438). That request was never processed or paid by HUD. (Tr. 438-39).

**D. Livecchi's Default, Continental's Mortgage Assignment and HUD's Foreclosure**

    **1. Livecchi's Decision to Cease Making Mortgage Payments:**

       Failing to receive payment on his November 1996 RFR request, Livecchi advised HUD by letter dated January 15, 1997 that he had discussed the matter with "a couple of attorneys" and they had counseled him to discontinue paying that portion of his monthly mortgage payment that represented the monthly RFR deposit. (G. Ex. 61; Tr. 28). According to Livecchi's letter, the attorneys advised him instead to deposit those funds into a bank account with CRL acting as escrow agent "while we are suing HUD." (*Id.*). The letter concluded with the statement:

> It seems to be the only way to resolve the issue of the [RFR] is by
> going to court and suing all parties involved for the damages that
> you are causing to Cambridge Court Apartments for the games that
> are being played by HUD.

(*Id.*).

       On March 27, 1997, HUD responded to Livecchi's January 15, 1997 letter. (G. Ex. 21). HUD's letter informed Livecchi that HUD had denied Livecchi's RFR request based on Livecchi's violations of the Regulatory Agreement, specifically, Livecchi's failure to submit audited financial statements for 1995; Livecchi's failure to maintain the Property in a satisfactory condition as set forth in an inspection report; and, his failure to submit an adequate capital needs budget. (*Id.*). The letter further cautioned Livecchi that failure to correct the violations could result in the declaration of a default under the Regulatory Agreement and resort by HUD to "any and all rights set forth in paragraph 11" of the Agreement. (*Id.*).

Consistent with his expressed intent in the January 1997 letter, Livecchi withheld $2,013 – the required monthly RFR deposit – from his February mortgage payment to Continental. (G. Ex. 24; Tr. 445). He did the same the following month. (G. Ex. 24; Tr. 446). In conjunction with his March mortgage payment, Livecchi sent a letter to Continental demanding that Continental "release HUD from the mortgage insurance on my property immediately." (D. Ex. AA; Tr. 440-41). He explained that he was not paying the RFR deposit "since this was only a HUD requirement." (D. Ex. AA). Livecchi further informed Continental of his intent to "commence legal action" in the event that Continental did not "eliminate HUD from th[e] property" within thirty days. (*Id.*).

In April 1997, Livecchi again withheld the monthly RFR from his mortgage payment. (G. Ex. 24; D. Ex. EE). The mortgage payment was also short by an additional $5,412.93, which was the subject of a dispute between Livecchi and Continental. According to Livecchi, he had received an IRS Form 1099 statement from Continental incorrectly reflecting that Continental had paid him that amount in interest on his mortgage escrow account. (Tr. 444-45). For this reason, Livecchi testified, he also withheld $5,412.93 from his April mortgage payment. (Tr. 450-52). At the time, he sent a contemporaneous letter to Continental advising the company of his intent to "fil[e] criminal charges against [it] for extorting monies from [his] account." (D. Ex. EE).

Contrary to Livecchi's instructions, Continental applied Livecchi's April mortgage payment to cover the March arrears, including the delinquent RFR deposit. (Tr. 570-73). As a result, Continental determined that Livecchi was delinquent in his April payment of loan principal. By letter dated April 15, 1997, Continental advised Livecchi that if he did not

12

cure the deficiency by the end of April, Continental would be required to file a "Notice of Default" with HUD. (G. Ex. 23). Livecchi thereafter stopped payment on the check representing the April payment. (G. Ex. 24; Tr. 452).

Livecchi made no further mortgage payments. (Tr. 272, 453, 559). He testified that he stopped making the mortgage payments because he had concluded that nothing he did "was [ever] good enough for [HUD]." (Tr. 443). He further testified that he had tried to pay off the loan in the first year, but discovered that it was subject to a prepayment prohibition for the first five years.[7] (Tr. 443). As he testified, his purpose in not making any additional mortgage payments was to induce Continental to call the note so he could pay it off. (Tr. 443, 453).

## 2. HUD'S March 1997 Notice of Intent to Request a Civil Money Penalty:

On March 18, 1997, HUD sent Livecchi a written "Notice of Intent to Request a Civil Money Penalty." (G. Ex. 67; Tr. 441). The Notice advised him that HUD was considering imposing a civil penalty against him for failure to submit annual financial statements for 1995. (G. Ex. 67). Livecchi responded to HUD's March 18 Notice of Intent by providing a copy of "certified audits" for the Property. (D. Ex. DD; Tr. 442). In a separate letter, Livecchi stated that a copy of his 1995 financial statements had previously been sent to HUD and that he was unaware that HUD wanted an additional copy. (D. Ex. CC; Tr. 441).

---

[7] Pursuant to the terms of the mortgage note, which was signed by Livecchi in August 1992, Livecchi was prohibited from prepaying the loan for a period of five years until September 1, 1997. (Tr. 560-65; G. Ex. 80). Prepayment during the following year – September 1997 through September 1998 – was subject to a five percent penalty. (G. Ex. 80; Tr. 565). The prohibition and penalty could be avoided only in the event of a mortgage default meeting certain conditions. (G. Ex. 80).

### 3. **Livecchi's Cancellation of Insurance Coverage for the Property**:

Livecchi cancelled his insurance policy for the Property effective May 30, 1997. (G. Exs. 25, 26; Tr. 82-83). Continental and HUD each wrote to Livecchi informing him of his obligation to maintain property insurance and directing him to promptly advise Continental of his new insurance coverage. (G. Exs. 25, 69). When Livecchi failed to respond to these inquiries, Continental was forced to obtain property insurance for the benefit of the mortgagee. (G. Ex. 26a; Tr. 83-84).

At trial, Livecchi testified that he had purchased a new policy after cancelling the first and vigorously disputed that he had ever allowed insurance to lapse on the Property. (Tr. 484, 605-10, 658). No documentary evidence was presented by Livecchi, however, showing that he had purchased insurance effective May 30, 1997. Livecchi explained that he was unable to provide records of the purchase because he had lost his business records as a result of the Property's foreclosure.[8] (Tr. 611). Livecchi did not dispute that he had not provided evidence of coverage to either Continental or HUD.

### 4. **Continental's Assignment to HUD and the Parties' Communications Concerning a Reinstatement Plan**:

On May 1, 1997, Continental informed HUD of Livecchi's default and its election to assign the mortgage. (G. Ex. 24; Tr. 31). By letter dated July 18, 1997, HUD advised Livecchi of Continental's election. (G. Ex. 27; Tr. 16-18). The letter stated that Livecchi needed to pay all delinquencies immediately in order to avoid the assignment and foreclosure. (*Id.*). If

---

[8] Livecchi testified that approximately ten days after the foreclosure, he was barred by United States Marshals from entering CRL's office that was located on the Property. (Tr. 486, 618-19). When questioned by the Court, he admitted that he had no discussions with HUD officials concerning the retrieval of the records and other property in CRL's office. (*Id.*).

Livecchi were unable to do so and the mortgage were assigned, he could submit a "reinstatement plan designed to bring the mortgage current through principal within 36 months of the assignment." (*Id.*). For a plan to be acceptable, it could not include terms that would require HUD to capitalize delinquent interest or to forgive principal. (*Id.*; Tr. 18).

Lamberty testified that the purpose of this letter was "to try to resolve the matter with Mr. Livecchi, and bring him back into compliance with the Regulatory Agreement." (Tr. 16, 86). According to Lamberty, HUD was prohibited by law from forgiving debt and a thirty-six month period was the longest reinstatement period permitted by HUD. (Tr. 18, 86, 103).

Livecchi's attorney responded to HUD in writing on July 23, 1997. (D. Ex. GG). His letter requested that HUD supply certain information relating to the escrow and RFR accounts to assist him in preparing a reinstatement plan. (*Id.*). Livecchi testified that at the time of this letter he was "trying to work out anything at all possible with HUD to allow [him] to pay off the mortgage, to get rid of them." (Tr. 455). HUD responded to the requests for information by letter dated October 3, 1997. (G. Ex. 29).

On August 25, 1997, Continental filed the mortgage assignment to HUD. (D. Exs. HH, TT; Tr. 32). According to the statement prepared by Continental, at the time of the assignment, the balance of the unpaid principal of the loan was $2.328 million. (*Id.*). After applicable escrow and other adjustments, HUD paid Continental approximately $2.252 million on the assignment. (G. Ex. 28; Tr. 287).

Following the assignment, HUD wrote to Livecchi outlining his obligations to HUD and reminding him of the legal prohibition against using income from the Property for any

purpose other than necessary operating expenses. (G. Ex. 29; Tr. 35-36). The letter referred

Livecchi to 12 U.S.C. § 1715z-4a for a specification of permissible expenses.[9] (G. Ex. 29; Tr.

271-72). The letter further directed Livecchi to deposit into a HUD lockbox any cash remaining

after payment of reasonable expenses so that HUD could apply the funds to Livecchi's mortgage

obligations. (*Id.*).

On December 30, 1997, Livecchi sent a letter to HUD's Washington, D.C. office,

addressed to "To Whom It May Concern." The four-paragraph letter contained a one-paragraph

proposal to buy the mortgage for $1.9 million. (D. Ex. LL; Tr. 473). Specifically, the paragraph

stated:

> I would like to make a[n] offer to buy your mortgage in the amount
> of $1,900,000.00, this would mean that you will turn over my
> escrow accounts to me at the time of closing. According to my
> calculations, you should have approximately $180,000.00 in the
> [RFR] and about $40,000.00 in the tax escrow account.

(D. Ex. LL). No copies of the letter were sent to HUD's Buffalo office.

On that same day, Livecchi sent a letter to HUD's Office of Administrative Law

Judges in Washington, D.C. (D. Ex. WW; Tr. 467). Livecchi complained of unspecified

violations of the Regulatory Agreement by the Buffalo office and sought advice about how to

initiate action against the Buffalo office. (*Id.*).

Several days later, on January 6, 1998, Lamberty wrote to Livecchi advising of

HUD's intent to initiate foreclosure proceedings due to Livecchi's default and the absence of an

acceptable reinstatement plan. (G. Ex. 30; Tr. 21). The letter did not refer to Livecchi's

---

[9] That section also provides for an award of double damages in the event of a violation and is the same
statute at issue in this case. *See* 12 U.S.C. § 1715z-4a(c).

December 30, 1997 letter or otherwise indicate that Lamberty was aware of Livecchi's proposal.

Lamberty's letter again advised Livecchi that foreclosure could be avoided if he submitted an

acceptable reinstatement plan to the HUD Buffalo office. (*Id.*). Lamberty testified that HUD

remained open to negotiating a reinstatement plan up to the point that a foreclosure

commissioner was appointed. (Tr. 87).

On January 15, 1998, Livecchi sent a letter to Lamberty requesting a judicial

foreclosure. (D. Ex. YY). Livecchi testified that he sent this letter "[b]ecause I was not making

any headway with HUD whatsoever on trying to come up with an agreement, settle anything, pay

off the loan, anything." (Tr. 470). Livecchi felt that if the matter could be heard by a judge, "I

knew . . . that if I walked in front of a judge with the full amount of money to pay them off, I

don't believe any judge in New York State would stop me from paying them off." (*Id.*).

Five days later, on January 20, 1998, Livecchi again wrote to Lamberty, this time

to convey two proposals. (D. Ex. MM). Livecchi's first proposal was identical to the proposal

communicated in his earlier letter. (*Id.*). The second, alternative proposal was to "defer the

payment of interest and principal" for an unspecified period of time and to use the deferred

payments to make capital improvements, after which Livecchi would assume making full

payments. (*Id.*; Tr. 472-73).

Both proposals were rejected by HUD. (G. Ex. 31). The first proposal was

rejected because Livecchi's mortgage indebtedness exceeded the proposed purchase price and, as

Livecchi previously had been advised, HUD was legally prohibited from forgiving debt. (*Id.*; Tr.

107). The second proposal was rejected because HUD concluded that, "[t]o defer interest and

principal payments is essentially the same as forgiving debt in that [the debtor] would be

receiving the benefit of 'free' use of government funds for the period of deferment." (*Id.*; *see* Tr. 107). HUD reminded Livecchi that any acceptable reinstatement plan must provide for "bring[ing] debt payments current within acceptable time frames." (*Id.*). Livecchi acknowledged at trial that certain of his proposals were proposals to buy the mortgage at a discount. (Tr. 633).

At the end of February 1998, Livecchi wrote to Lamberty to express his desire to work out a reinstatement plan for the mortgage. (D. Ex. AAA). Livecchi testified that at the time he wrote the letter he was still trying to formulate a reinstatement proposal. (Tr. 476). As he explained, he wanted "to pay the whole thing and be rid of [HUD]." (*Id.*).

Various meetings were held between Livecchi and HUD during the late winter and spring of 1998 concerning the possible foreclosure of the Property.[10] (*See* G. Ex. 31a; D. Exs. BBB, CCC, ZZ; Tr. 617-18). Following one such meeting on May 7th, Livecchi submitted another written proposal to reinstate the mortgage. (D. Ex. CCC). Under this proposal, HUD would apply the balance in the RFR account to reduce the principal balance of the mortgage and Livecchi would make $15,000 monthly payments towards principal until the principal balance was reduced to $1.7 million, at which time Livecchi would pay the balance in one balloon payment. (*Id.*). The proposal did not address interest payments. Livecchi recalled that he did not receive a response to this proposal, and the record contains no documentary evidence that he did. (Tr. 480).

---

[10] During the same period, HUD sought to impose a LDP sanction on Livecchi as a result of his alleged breaches of the Regulatory Agreement. (G. Ex. 34; Tr. 23, 462-63). The record demonstrates that Livecchi appealed that sanction to Lamberty's supervisor, who affirmed it. (G. Ex. 70; Tr. 25). Livecchi testified that he was exonerated by an administrative law judge, but the record is devoid of any documents concerning his appeal to an administrative law judge or the basis for the judge's determination. (G. Ex. 70; Tr. 477-78, 654-55).

The government does not dispute that during the period of default, Livecchi continued to provide adequate housing to low income tenants.  (Tr. 250).

### 5.  **The Foreclosure Sale:**

HUD proceeded to foreclosure of the Property, and on November 12, 1998, the Property was sold at auction to a third party for $1.125 million.  (Tr. 356).  At the time of the foreclosure, the unpaid principal amount of the mortgage was approximately $2.328 million; the mortgage was in arrears in the amount of $556,397.  (G. Ex. 41; Tr. 613).

As a defaulting HUD mortgagor, Livecchi was not permitted by law to bid at the auction.  (Tr. 115, 256).  *See* 24 C.F.R. § 290.18.  Hours before the foreclosure sale was to occur, Livecchi and a group of investors to whom to he had agreed to sell the property sought a temporary restraining order in federal court cancelling or postponing the auction.  After a judicial hearing, HUD agreed to postpone the auction by several hours to allow Livecchi to cure the mortgage delinquency by tendering to HUD $566,000.  (G. Ex. 72).  Livecchi was unable to do so, and the sale proceeded.  His lawsuit was later dismissed.  (G. Exs. 72, 73).

The foreclosure resulted in a loss to HUD of approximately $1.2 million.  (Tr. 119, 216).  At the time of the sale, the balances in the RFR and tax escrow accounts were applied to reduce the amount of Livecchi's indebtedness.  (Tr. 113-14).

## **DISCUSSION**

## I. **Defendants' Counterclaims for Recoupment**

### A. **Overview:**

I turn first to the question of whether Livecchi has proved his counterclaim of recoupment. If so, I must determine the appropriate reduction to the previously-awarded judgment of $481,438.

With the Court's permission, defendants amended their answer following the summary judgment decision and prior to trial to add two counterclaims for recoupment, one sounding in contract, the other in tort. (Docket # 56). The first asserts recoupment based upon HUD's alleged breaches of the terms of the Regulatory Agreement, as well as its implied covenant of good faith and fair dealing. (*Id.* at ¶¶ 53-76). The second asserts recoupment based upon HUD's alleged "tortious administration [of] the HUD-insured loan with the consequence or intention of causing damages to the defendants." (*Id.* at ¶ 78). In reply, the United States asserted various affirmative defenses, including the equitable doctrines of unclean hands and estoppel. (Docket # 60).

The doctrine of recoupment permits a party sued by the United States to seek to recover or "recoup damages . . . so as to reduce or defeat the government's claim . . . [even] though no affirmative judgment . . . can be rendered against the United States." *United States v. Forma*, 42 F.3d 759, 765 (2d Cir. 1994) (internal quotation omitted). In other words, recovery under a recoupment counterclaim may not exceed the principal amount claimed by the United States. *United States v. United States Fidelity & Guar. Co.*, 309 U.S. 506, 511 (1940).

Otherwise, it would be barred by the doctrine of sovereign immunity in the absence of specific Congressional authorization for the claim. *United States v. Forma*, 42 F.3d at 764.

One theory for this exception to the doctrine of sovereign immunity is that "a counterclaim seeking a set off or recoupment is properly conceptualized as a defense, arising out of the transaction that grounds the main action, and therefore will not be jurisdictionally barred when there is jurisdiction for the main action." *Id.* at 765 (internal quotations omitted) (collecting cases). Another theory is that "the recoupment-counterclaim exception to sovereign immunity derives from the concept of waiver – *i.e.* 'when the sovereign sues it waives immunity as to the claims of the defendant which assert matters in recoupment.'" *Id.* (quoting *Frederick v. United States*, 386 F.2d 481, 488 (5th Cir. 1967)) (collecting cases). Whatever the theory, the equitable doctrine permits a defendant to assert a claim in order to reduce or eliminate the amount of damages recoverable by the plaintiff so long as the claim arises from the same contract, transaction or occurrence as plaintiff's claim. *United States v. Green*, 33 F. Supp. 2d 203, 223 (W.D.N.Y. 1998). *See also First Nat. Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n.1 (4th Cir. 1982) ("[r]ecoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim) (citing 6 C. Wright & A. Miller, *Federal Practice and Procedure, Civil* § 1401).

Analysis of Livecchi's claim that HUD breached its implied covenant of good faith and fair dealing begins with the proposition that every contract contains an implied covenant "embrac[ing] a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Tractebel*

*Energy Mrktg., Inc. v. AEP Power Mrktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (internal

quotations omitted). *Accord Chambery v. United States*, 54 Fed. Cl. 2, 7 (2002) (covenant of

good faith and fair dealing is implicit in HUD regulatory agreement). In evaluating whether

government officials acted in good faith, the court must presume that they acted conscientiously

and in good faith in discharging their responsibilities. *Chambery v. United States*, 54 Fed. Cl. at

7. *See also Schaghticoke Tribal Nation v. Norton*, 2007 WL 867987, *2 (D. Conn. 2007)

("government officials are presumed to act in good faith") (quoting *China Trade Ctr., LLC v.

Washington Metro. Area Transit Auth.*, 34 F. Supp. 2d 67, 70-71 (D.D.C. 1999)). In order to

overcome this presumption, "a plaintiff must allege and irrefragably prove, by clear and strong

evidence, specific acts of bad faith on the part of the government that establish some specific

intent to injure the plaintiff." *Chambery*, 54 Fed. Cl. at 7-8. Proof of "[d]isagreement or even an

incorrect reading of a contract" is insufficient. *Id.* at 7.

### B. <u>Summary of Defendants' Claims</u>:

Following trial, defendants submitted a joint memorandum summarizing their

argument that they are entitled to a complete elimination of the government's damages under the

doctrine of recoupment. First, they contend that the trial proof demonstrates that HUD breached

the terms of the Regulatory Agreement by wrongfully delaying and withholding payment of

certain of Livecchi's RFR requests. (Docket # 98-2 at 19-20). Second, they maintain that HUD

breached the Agreement's implied covenant of good faith and fair dealing. (*Id.* at 20-23).

According to defendants, this breach was occasioned by HUD's alleged wrongful actions in:

(1) insisting on submission of accrual-based financial statements; (2) insisting on submission of a

capital needs budget; (3) resorting to foreclosure rather than other less drastic contractual

remedies; (4) failing to arrange meetings between Lamberty and Livecchi; and, (5) notifying the Rochester Housing Authority that Livecchi's insurance had lapsed on the Property.  (*Id.* at 22). Livecchi calculates that he has suffered millions of dollars in damages in lost property and income as a result of these breaches.  (*Id.* at 25).

The government counters that defendants' recoupment claim fails for several independent reasons.  First, the government argues that it is foreclosed by the terms of the 1994 Settlement Agreement vesting in HUD "the exclusive right to determine [Livecchi's] compliance with HUD's rules, regulations and requirements."  (Docket # 97 at 47; *see* G. Ex. 12 at ¶ 6). Next, the government urges the Court to find that defendants themselves engaged in inequitable conduct that defeats their equitable claim for recoupment.  (Docket # 97 at 48-50).  Finally, the government argues that Livecchi's claims – if not foreclosed legally or equitably – simply lack merit.  (*Id.* at 50-57).

Defendants' post-trial brief contains no discussion of their second counterclaim alleging that HUD's actions constituted tortious conduct entitling Livecchi to recoupment. Rather, their argument is devoted exclusively to proving that HUD breached its contractual obligations to Livecchi.  On this record, this Court finds that defendants have abandoned their second counterclaim.  *See*, *e.g.*, *Desiderio v. Celebrity Cruise Lines, Inc.*, 1999 WL 440775, *3 (S.D.N.Y. 1999) (finding claim abandoned where plaintiff's post-trial submissions included no proposed findings of fact or conclusions of law on such claim); *McAllister Bros., Inc. v. Ocean Marine Indem. Co.*, 1992 WL 34152, *6 (S.D.N.Y. 1992) (dismissing defendants' counterclaim as abandoned where defendants had not referred to it in pretrial or post-trial briefs); *Sonnenblick-Goldman Corp. v. Marbella Del Caribe, Inc.*, 412 F. Supp. 439, 445 (S.D.N.Y.

1975) (finding defendant had abandoned its counterclaims, noting that counterclaims were not argued in defendant's post-trial brief).

## C. **Livecchi's Claim that HUD Breached the Regulatory Agreement by Insisting on Accrual-Based Financial Statements and Denying Payment of Livecchi's RFR Requests in the Absence of Such Statements:**

The first contention that Livecchi raises in his recoupment counterclaim – that HUD was not legally permitted to withhold payment of Livecchi's RFR requests on the grounds that he had failed to submit accrual-based financial statements – is the same claim that was the subject of the 1994 LDP administrative proceeding. In that proceeding, HUD filed a Complaint alleging that Livecchi had breached the provisions of the Regulatory Agreement that required him to keep the books and records of the Project, and to furnish HUD with an annual financial report, "in accordance with the requirements of the Secretary." (G. Ex. 10 at ¶¶ 8, 15; G. Ex. 4 at ¶¶ 9(d), 9(e)). Specifically, the Complaint asserted that Livecchi had breached those provisions by not submitting the annual statements in the accrual-based format that HUD required by the terms of the its Handbook, *Financial Operations and Accounting Procedures for Insured Multifamily Projects*. (G. Ex. 10 at ¶ 15). As an affirmative defense to the Complaint, Livecchi claimed that HUD had breached the Regulatory Agreement by arbitrarily and capriciously denying his RFR requests. (G. Ex. 11).

This dispute was resolved by the parties in their 1994 Settlement Agreement. In that Agreement, in return for HUD's dismissal of the administrative proceeding, Livecchi promised

> to comply fully with all rules, regulations and other requirements
> of HUD, and specifically with respect to HUD's requirement of
> accrual based financial statements [and to] begin submission of

24

such accrual based financial statements for fiscal year 1994 on or
before March 1, 1995, and, thereafter, use accrual based accounting
in such submissions to HUD.

(Docket # 12 at ¶ 1). Livecchi further agreed to "waive, release and remit any and all claims that

he may have had with respect to th[e] administrative proceeding or the issuance by [HUD] of the

LDP." (*Id.* at ¶ 5). HUD, in turn, agreed to "process" Livecchi's outstanding RFR requests

within ten days; it explicitly reserved the right to deny the requests if "in HUD's sole

determination" [Livecchi] had failed to satisfy "HUD's requirements for such approval." (*Id.* at

¶ 2).

Considering the explicit terms of the Settlement Agreement, I conclude that

certain aspects of Livecchi's challenge to HUD's denial of his RFR requests cannot survive the

execution of the Agreement. For example, to the extent that Livecchi now seeks to attack HUD's

actions in denying or delaying RFR requests prior to the date of the Settlement Agreement, that

challenge is foreclosed by his agreement to release any claims relating to the administrative

proceeding. As noted above, that argument was specifically raised by Livecchi as an affirmative

defense to HUD's administrative Complaint.

I also find that Livecchi's challenge to HUD's "insistence on accrual-based

financial statements" as arbitrary, capricious or taken in bad faith is inimical to his agreement in

paragraph 1 of the Settlement Agreement to provide HUD with annual accrual-based financial

statements and is contrary to the credible proof offered at trial. That evidence demonstrated that

the requirement of accrual-based financial statements was sufficiently important to HUD to

compel it to initiate an administrative proceeding in an attempt to induce Livecchi's compliance

with the requirement.  In her trial testimony, Lamberty explained the reason for HUD's commitment to that accounting methodology:

> Accrual-based accounting indicates when income was earned, and when expenses . . . occurred. . . .  On a cash basis, you just say when the cash came in, and when the cash went out, it doesn't give you a true picture . . . of what the expenses and the income of the property really are.  . . .
>
> A cash basis accounting can skew what income, or what cash really exists at the end of an accounting period.  . . .  Cash basis, you can hold off in paying items until a later date, so it shows that you have a larger cash balance than you really have available for the property.

(Tr. 40-41).  While Lamberty admitted that examination of cash-based financial statements may provide an accurate depiction of a project's true financial condition, Lamberty explained that such an examination would need to encompass several years of cash-based statements in order to yield reliable results.  (Tr. 188-89).  This rational explanation of HUD's commitment to accrual-based accounting, coupled with the efforts HUD expended in the administrative proceeding to induce Livecchi's compliance, refutes any suggestion by Livecchi that HUD's "insistence" on accrual-based statements was arbitrary, commercially unreasonable or taken in bad faith.

Even if HUD's insistence on accrual-based accounting was permissible, Livecchi contends that his non-compliance with that requirement did not justify HUD's refusal to pay his RFR requests.  The record proves that following the Settlement Agreement, HUD paid Livecchi a total of $108,519 in connection with seven RFR requests aggregating $137,002.  (G. Ex. 71).  Of that total, $20,712 was requested on Livecchi's final RFR request made in November 1996,

which was never processed or paid by HUD.[11]  (*Id.*).  Livecchi does not challenge any specific

component of the $7,771 that was denied in connection with the six earlier requests; rather, he

challenges HUD's conduct in refusing to process various of his RFR requests unless and until he

had submitted accrual-based financial statements.

Livecchi's argument that HUD breached the Regulatory Agreement by refusing to

process RFR requests on this basis is premised upon the absence of any explicit term of the

Regulatory Agreement or the Settlement Agreement expressly authorizing HUD's conduct.

(Docket # 98-2 at 19).  To the contrary, I find that the Regulatory Agreement and the Settlement

Agreement, read together, implicitly authorized HUD's conduct.  The Regulatory Agreement

_____

[11]  The record demonstrates that Livecchi's final RFR request was submitted in November 1996 and was not paid.  It appears that the reason it was not paid at the time it was submitted was because HUD believed that Livecchi was delinquent on his obligations to submit accrual-based financial statements for 1995 and a capital needs budget.  The record is unclear whether HUD's belief concerning the financial statements was accurate.  Livecchi testified that he did submit audited financial statements in proper format for 1995 (Tr. 441-42); the government does not contest that representation.  (*See* G. Ex. 74).  The record does not reveal, however, when these statements were submitted and specifically whether they had been submitted by the time Livecchi made his November 1996 RFR request.

On this record, I conclude that a reduction in the amount of the government's judgment is not warranted on the grounds that HUD breached the Regulatory Agreement by not paying the November 1996 RFR request.  Livecchi bears the burden of proof on his counterclaim, and he has not shown that the 1995 statements had been submitted by the time of his November RFR request.  Even if they had been, I find that HUD's failure to promptly pay one RFR based upon its mistaken belief that Livecchi had not complied with his contractual obligations does not amount to a breach of the Regulatory Agreement (which is silent as to the time frame for processing RFR requests) or HUD's obligation of good faith and fair dealing.  *See Liberty Mut. Ins. Co. v. Precision Valve Corp.*, 402 F. Supp. 2d 481, 490 (S.D.N.Y. 2005) (allegations of mistakes and negligence do not support affirmative defense of breach of good faith and fair dealing).

In any event, the record demonstrates that because HUD did not pay the RFR request, the balance in the RFR account was never reduced by that amount.  At the time of the foreclosure, that balance (approximately $140,000) was applied to reduce Livecchi's indebtedness to HUD.  (Tr. 113; G. Ex. 42).  That application was entirely consistent with the terms of the Regulatory Agreement, which provided that in the event of a default pursuant to which the loan was accelerated, HUD was authorized to apply the RFR balance to the amount of the mortgage debt.  (G. Ex. 4 at ¶ 2).  *See Chambery*, 54 Fed. Cl. at 7 ("paragraph 2(a) [of the Regulatory Agreement] unambiguously gives HUD discretion to apply the total amount, both principal and interest, in the reserve account to the outstanding mortgage debt").  Accordingly, even if HUD's actions in not paying the November 1996 RFR request could be considered a breach, which I do not believe they can, Livecchi has not demonstrated that he has suffered compensable damages as a result.

specifically provided that the RFR account was to remain "at all time under the control of the mortgagee" (Continental) and not the owner (Livecchi). (G. Ex. 4 at ¶ 2). *See Chambery*, 54 Fed. Cl. at 8 ("[t]he [Regulatory] Agreement explicitly establishes HUD's control of funds in the reserve account"). It further provided that disbursements from the RFR account could be made "only after receiving the consent in writing of the Secretary [of HUD]." (G. Ex. 4 at ¶ 2). The Agreement contained no restrictions on the Secretary's consent beyond the implied obligation of good faith and fair dealing, which this Court already has determined was not violated by HUD's requirement that Livecchi submit annual financial statements in accrual-based format.

The Settlement Agreement also expressly reserved to HUD the sole and exclusive right to determine whether Livecchi had satisfied "HUD's requirements for [] approval" of the RFR requests. (Docket # 12 at ¶ 2). Similarly, paragraph 6 of the Agreement afforded HUD "the exclusive right to determine [Livecchi's] compliance with HUD's rules, regulations and requirements." (*Id.* at ¶ 6). Like the Regulatory Agreement, the Settlement Agreement is silent as to the specific requirements for payment of RFR requests.

By virtue of Livecchi's agreement in the Settlement Agreement to cede to HUD the exclusive authority to determine whether he had satisfied HUD's requirements for payment, I find that HUD's conduct with respect to the RFR payments cannot be challenged in this judicial action absent proof that it violated of its duty of good faith and fair dealing. *See Sweetheart Cup Co., Inc. v. Buchberg Inv. Holdings, Inc.*, 2005 WL 1515405, *2 (S.D.N.Y. 2005) ("sole discretion" clauses are subject to implied covenant of good faith and fair dealing) (collecting cases). Such proof is absent. Lamberty testified that one of HUD's requirements for payment of

RFR requests was the owner's submission of accrual-based statements. (Tr. 47-52). As she explained:

> In order to know the financial situation of the property, we have to have the financial statements. Lacking the financial statements, we cannot authorize releases from the [RFR], which might jeopardize the property physically or financially.

(Tr. 50). Livecchi certainly was aware at the time he signed the Settlement Agreement that HUD viewed the obligation to submit accrual-based statements as a condition to payment. Indeed, one of his earlier RFR requests had been denied precisely on that basis. (G. Exs. 6, 48). Moreover, following the Settlement Agreement, HUD consistently refused to process RFR requests on this basis, and nothing in the record suggests that HUD's assertion of this prerequisite to payment was pretextual in any fashion. On this record, I reject Livecchi's contention that HUD acted in bad faith or unreasonably by refusing to process Livecchi's RFR requests where it lacked current and reliable information about the Project's financial condition.

**D. Livecchi's Claim that HUD Breached the Regulatory Agreement by Insisting on Submission of a Capital Needs Budget and Denying Payment of Livecchi's RFR Requests in the Absence of Such Budget:**

Livecchi also contends that HUD breached the terms of the Regulatory Agreement, as well as its covenant of good faith and fair dealing, by its "repeated insistence" that Livecchi submit a capital needs budget and its refusal to make RFR payments in the absence of such a budget. (Docket # 98-2 at 19-22). Livecchi is correct that unlike the requirement of annual financial statements, nothing in the Regulatory Agreement or the parties' Settlement Agreement specifically mentions a requirement of a long term capital needs budget. Whether, as Livecchi posits, the agreements' silence can be interpreted as prohibiting HUD's right to require

such a budget as a condition of RFR payment is an issue this Court needs not resolve, however. Nor does the Court need to reach the government's countervailing contention that HUD's conduct was implicitly authorized by the provision in the Settlement Agreement granting HUD sole discretion to determine whether Livecchi has satisfied its requirements for payment.

The record is clear that HUD never delayed or denied payment on Livecchi's RFR requests solely on the basis of his failure to have submitted an acceptable capital needs budget.[12] Rather, such requests were denied on the twin grounds of failure to submit a capital needs budget and failure to submit accrual-based financial statements. (G. Exs. 18, 19, 21). Because I have determined that HUD did not breach its contractual obligations by refusing or delaying payment on requests made when Livecchi was delinquent in submitting the required financial statements, I need not address whether HUD's actions would have been similarly lawful if taken only in response to a delinquent capital needs budget.

### E. Livecchi's Claim that HUD Breached Covenant of Good Faith and Fair Dealing by Not Scheduling Meetings for Him with Lamberty:

Livecchi's contention that HUD breached its implied covenant of good faith and fair dealing by not arranging any meetings between Lamberty and Livecchi after 1995 must be rejected. (Docket # 98-2 at 22). The record is devoid of evidence that Livecchi ever requested a meeting directly with Lamberty that was refused. (*See* Tr. 426). The record is replete, however, with written communications between the two. (G. Exs. 18, 19, 20, 27, 29, 30, 31, 34; D. Exs. Q, Y, M, XX, YY, ZZ, AAA, III). Moreover, Livecchi has proffered no evidence to support his contention that he was contractually or legally entitled to meet with Lamberty, as opposed to

---

[12] Indeed, the record shows that in November 1994, HUD processed and paid an RFR request even though its request for a capital needs budget was still outstanding. (G. Ex. 52).

other HUD officials, and the record proves that Livecchi in fact met with HUD officials on several occasions after 1995 relating to alleged violations of the Regulatory Agreement. (G. Ex. 70; D. Exs. CCC, ZZ; Tr. 617-18). The record further demonstrates that Lamberty wrote to Livecchi in October 1995 and stated that she and the Director of Multifamily Housing would be "more than willing to have a meeting" with him to discuss his concerns about the RFR. (G. Ex. 20). In sum, Livecchi's argument that HUD acted in bad faith by not meeting with Lamberty – when it is not even clear that Livecchi ever requested such a meeting – lacks both legal and factual support.

### F. Livecchi's Claim that HUD Breached its Covenant by Not Exploring Contractual Remedies Other than Foreclosure:

Equally unavailing is Livecchi's argument that HUD breached its covenant of good faith and fair dealing by proceeding to foreclosure without pursuing any of the other remedies provided for in the Regulatory Agreement. As Lamberty acknowledged, the Regulatory Agreement authorized HUD to take various remedial actions in the event Livecchi violated any of his obligations under the Agreement. (Tr. 222, 234-35, 278; G. Ex. 4 at ¶ 11). The Agreement did not obligate HUD, however, to resort to any or all particular remedies or to resort to them in any particular order. Indeed, the first remedy identified in the Agreement is the one taken by HUD – acceleration of the debt and foreclosure of the Property. (G. Ex. 4 at ¶ 11(a)).

As Lamberty explained at trial, the other remedies specified in the Regulatory Agreement each involved the potential for substantial expense and burden to HUD. (*See* Tr. 221, 234, 257, 279). Certainly, the duties of collecting rents, preserving the Property and operating the Project necessarily would have imposed significant administrative burdens on HUD. (G. Ex.

4 at ¶ 11(b)).  So, too, would the remedy of taking possession of the Property and operating it until Livecchi was "again in a position to operate the [P]roject in accordance with the terms of the th[e] Agreement."  (G. Ex. 4 at ¶ 11(c)).  The last remedy specified – legal action, including the appointment of a receiver to operate the Project – also would have entailed material costs and the likelihood of delay in any eventual foreclosure.

Of course, the foreclosure remedy that HUD did elect to pursue resulted in a substantial loss to the government of approximately $1.2 million.  No evidence in the record demonstrates or suggests, however, that HUD anticipated such a substantial loss, or even any loss at all.  Indeed, Lamberty testified that she believed that the Property's fair market value was at least equal to the amount of the outstanding mortgage.  (Tr. 217, 221, 232).  The fact that Livecchi himself contends that he had negotiated a sale of the Property during the same time period for an amount exceeding the mortgage undercuts his argument that HUD should have anticipated the loss and thus acted in bad faith and commercially unreasonably by proceeding to foreclosure.

As Lamberty testified, HUD took the risk that the Property would sell for more or less than the amount of the indebtedness.  (Tr. 222-24, 232, 278-79).  Such risk was one that HUD was legally permitted to take; that it in fact resulted in a loss does not transform it into an unlawful action.  To the contrary, I find that the Regulatory Agreement specifically authorized HUD's decision to foreclose, and nothing in the trial record proves that HUD breached its covenant of good faith and fair dealing when it did so.

In sum, contrary to Livecchi's contention that HUD's conduct was "imprudent and precipitous" (Docket # 98 at 41), the record demonstrates that HUD acted in a measured and

restrained manner in proceeding to foreclosure. HUD waited over eighteen months following Livecchi's default before conducting a foreclosure sale and only invoked that remedy after affording Livecchi ample time and repeated opportunities to submit an acceptable reinstatement plan.[13]

### G. Livecchi's Claim that HUD Breached its Covenant by Providing False Information to the Rochester Housing Authority:

Livecchi's final contention in support of his recoupment counterclaim is that HUD breached its duty of good faith and fair dealing by notifying the Rochester Housing Authority ("RHA") that insurance for the Property had lapsed, when in fact it had not. (Docket # 98-2 at 22). Livecchi maintains that as a result of HUD's erroneous notification, RHA terminated its Section 8 contracts with Livecchi, causing a loss to him of $27,500 in rental income. (*Id.* at 23). I conclude that this claim is far too speculative and lacking in evidentiary support to warrant a reduction in the amount of the government's judgment.

At trial, neither party called as witnesses any representatives of RHA. Thus, the Court is without any testimony from RHA describing the communications, if any, that RHA had with HUD on the subject of insurance coverage for the Property or explaining its decision to terminate Section 8 contracts with Livecchi. While Livecchi testified to his understanding that in early 1998 HUD had advised RHA that he did not have insurance on the Property (Tr. 481), he was not present during or a party to any such communication. Thus, even if such a communication occurred, the record is silent as to which party initiated it and whether any

---

[13] Contrary to its pretrial submissions, Livecchi does not now contend that the trial proof demonstrated that HUD breached its obligations by not agreeing to any of the proposals tendered by Livecchi. In any event, HUD cannot be said to have acted in bad faith by rejecting proposals by Livecchi to buy the mortgage at a discount or to renegotiate the terms of the mortgage to reduce the principal or capitalize delinquent interest.

inaccurate information was conveyed.  For example, I am not persuaded that if HUD had advised

RHA that Livecchi had submitted no proof of coverage, such a statement would have been false.

No credible evidence exists in the record that he ever submitted proof to either Continental or

HUD, even assuming that he had purchased another policy after cancelling his coverage in May

1997.  In other words, there is no convincing proof that HUD ever confirmed the existence of

property insurance coverage beyond that which Continental had force placed for its benefit alone.

   The trial record does make clear that some communications took place between

Livecchi and RHA's Director of Leasing Operations, John Haire, in February 1998.  On February

5, 1998, Haire wrote to Livecchi referencing an earlier letter of January 28, 1998 that required

Livecchi to submit to RHA by February 4, 1998 evidence of insurance coverage for the Property.

(D. Ex. GGG).  The February 5, 1998 letter noted that no such evidence had been received by the

February 4th deadline and that such failure constituted a breach of Livecchi's Section 8 contracts.

(*Id.*).  The letter further informed Livecchi that the Section 8 contracts where being terminated

"effective immediately."  (*Id.*).  While a subsequent letter from Livecchi to HUD asserted that

Livecchi had provided proof of coverage to RHA on February 5, 1998 (D. Ex. III), the record is

unclear – absent testimony from RHA – whether RHA received such proof; whether, if it did,

RHA determined that it had been submitted too late; or whether it found the purported proof

wanting.  For example, although Livecchi's letter claimed to have provided proof of coverage to

RHA on February 5, the copy of the policy admitted at trial reflects a coverage initiation date of

February 9, 1998, and states that it is a new, not renewal, policy.  (D. Ex. QQ; Tr. 631).

   In sum, I find that the absence of credible proof concerning the substance of

communications, if any, between HUD and RHA and the reasons for RHA's decision to

terminate Livecchi's Section 8 contracts defeats his counterclaim. Simply stated, the trial record contains no reliable proof that HUD communicated erroneous information to RHA, let alone that it did so in bad faith or with malice or injurious intent.

### H. **Summary**:

For all the reasons explained above, Livecchi has not met his burden of proof on his claim for recoupment. In sum, he has failed to establish that HUD breached the Regulatory Agreement by delaying or denying payment of his RFR requests on the grounds that he failed to comply with his obligation to submit accrual-based financial statements. He has also failed to demonstrate that HUD breached its implied covenant of fair dealing and good faith by engaging in any of the challenged conduct.[14] Because I conclude that Livecchi's counterclaim is without merit, I do not reach the government's alternative contention that Livecchi's claim for equitable relief should be denied on the basis of his own inequitable conduct. Accordingly, the government's judgment in the amount of $481,438 will not be reduced, and Livecchi's counterclaims are dismissed with prejudice.

---

[14] This finding also obviates the need to resolve the parties' dispute over which actions of, or interpretations by, HUD are entitled to substantial deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). (*See* Docket ## 77-1 at 6-7, 97 at 54-57). Because I conclude that HUD did not breach the Regulatory Agreement and acted in good faith and reasonably, its conduct would necessarily satisfy any applicable substantial deference standard.

## II. The Government's Claim for Double Damages

### A. Overview:

In addition to litigating defendants' recoupment claim, the purpose of the trial was to afford the parties the opportunity to develop the record sufficiently to inform the Court's judgment as to whether double damages should be awarded.  Both parties have vigorously advocated their opposing views of what discretion demands in this case.  The government urges the Court to impose such a penalty, arguing that "[t]here is no deterrence value in a decision that requires only repayment after the unlawful retention of several years of project funds."  (Docket # 97 at ¶ 229).  Livecchi argues that double damages are not necessary to achieve deterrence because "the 'deterrence' which HUD seeks has, as a result of the Court's determination that Livecchi is personally liable for the equity skimming assessment and violation of the Regulatory Agreement, already been achieved to a significant effect."  (Docket # 98-2 at 4).

The statute provides in relevant part:

> In any judgment favorable to the United States entered under this section, the Attorney General may recover double the value of the assets and income of the property that the court determines to have been used in violation of the regulatory agreement, . . . plus all costs relating to the action, including but not limited to reasonable attorney and auditing fees.

12 U.S.C. § 1715z-4a(c).  The legislative history reveals that the double damages provision was enacted to provide a greater deterrent to the unlawful use or retention of multifamily project income.  *See* H.R. Rep. No. 100-122(I), 115, reprinted in 1987 U.S.C.C.A.N. 3317, 3431 (statute "[e]xpands the Secretary's ability to deter the use of assets and income of multifamily housing

projects, under the National Housing Act, in violation of the project's regulatory agreement or applicable regulations, by providing a statutory double damages civil recovery remedy").

In my earlier decision granting summary judgment, I determined that an award of double damages is within the court's discretion to award or deny. (Docket # 40 at 26). Among the authority I relied upon in reaching that determination was the First Circuit's decision in *United States v. Cofield*, 215 F.3d 164 (1st Cir. 2000). In that decision, the Court explained:

> Double damages for the government on a deterrence rationale make sense primarily where the defendant is guilty of substantial or repeated fault. There is obviously a spectrum, with fraudulent intent or recklessness at one end and a lost record or close-call judgments at the other. . . . [D]efendants, after many years of service, [may have been] no worse than careless in the transactions in question. If so, we would regard this as an adequate basis for the court to exercise its discretion to deny double damages – although we do not suggest that seriously negligent acts could never justify double damages.

*Id.* at 171-72 (internal citations omitted).

**B.  Analysis:**

The parties devote considerable effort in their post-trial briefs to computing the number of violations of the Regulatory Agreement that Livecchi committed. The government calculates that number to be eighty-nine:  twenty-one violations of the requirement to pay the note and mortgage (G. Ex. 4 at ¶ 1); twenty-one violations of the requirement to pay RFR deposits (¶ 2); twenty-one violations of the prohibition against encumbering rental revenue (¶ 6(b)); twenty-one violations of the prohibition against retention of project funds (¶ 6(e)); four violations of the requirement to provide accrual-based annual financial statements (¶ 9(e)); and, one violation of the requirement to maintain a segregated account for project funds (¶ 9(g)).

(Docket # 97 at 30-34; G. Ex. 74).  By contrast, Livecchi argues that in essence he only committed a single violation of the Regulatory Agreement.  Under his theory, he breached the Agreement by not making the required mortgage payments, and all other breaches flowed from that one decision.  (Docket # 98-2 at 5).

The attention the parties have given to this question is understandable in view of the First Circuit's articulated view that the statutory remedy of double damages is most appropriate where the owner has engaged in substantial or *repeated* fault.  *Cofield*, 215 F.3d at 171.  By computing Livecchi's violations to approximate one hundred, the government contends that the *Cofield* element of repeated fault has been satisfied.  Livecchi counters that a single breach cannot meet this standard.  Although the determination of whether Livecchi's actions constituted eighty-nine separate breaches, or some lesser number, is to some degree an exercise in sophistry, the issue at the heart of the dispute is plainly relevant.  That issue, as I see it, is whether Livecchi's conduct should be considered an isolated exercise of carelessness or negligence or, by contrast, a purposeful course of conduct taken in wilful disregard of his contractual obligations.  I conclude that Livecchi's conduct falls within the latter category.

First, with respect to his failure to make his mortgage payments, it bears emphasizing that Livecchi failed to make monthly payments to either Continental and HUD during the twenty-month period between March 1997 and November 1998.  During this time frame, Livecchi repeatedly chose not only to ignore his monthly financing obligations, but also to retain monthly income from the Project's tenants in violation of the Regulatory Agreement.  Livecchi's suggestion that one breach flowed inescapably from the other is simply wrong.

Nothing prevented Livecchi from tendering to HUD the surplus cash as he was required, while still withholding the mortgage payments.

Second, during this same extended time period, Livecchi also chose repeatedly to ignore his separate obligations to make monthly deposits into his RFR account. That Livecchi himself considered this obligation independent of his obligation to repay the mortgage is evidenced by his decision in February and March 1997 to cease paying the RFR deposits, but to continue making the loan payments. During this same period, Livecchi also failed to provide annual financial statements for 1996 and 1997, in violation of his obligations under the Regulatory Agreement. Non-submission of annual statements is no more an occurrence that results automatically from the failure to make mortgage payments than is retention of project income. Nor is the failure to maintain a segregated bank account for project income – another of Livecchi's obligations under the Regulatory Agreement that he ignored in this case.

This same conduct, which supports a finding that Livecchi's fault was *repeated*, also supports a finding that it was *substantial*. Livecchi's conduct was far more deliberate and extensive than the isolated episode of carelessness or simple negligence that the *Cofield* court opined would be inadequate to warrant double damages. *United States v. Cofield*, 215 F.3d at 171. Livecchi himself admits that he made a purposeful decision to breach both the mortgage and the Regulatory Agreement in an attempt to pay off the mortgage and sever his contractual relationship with HUD. (Tr. 559-60). As an initial matter, it is not at all clear whether his desire to pay off the mortgage – even if genuine – would militate against a finding of substantial fault. The contract contained a prepayment prohibition that was in effect at the time Livecchi stopped making his monthly mortgage payment; as a result, default was the only mechanism to avoid that

contractual bar.  Second, and more importantly, the trial evidence refutes Livecchi's contention

that he sincerely attempted to pay off his loan obligations.  As the evidence shows, all of his

post-default proposals to HUD involved either buying the mortgage at a significant discount or

refinancing the loan on terms that would have involved forgiving principal or capitalizing

delinquent interest (terms expressly prohibited by HUD).[15]

No evidence demonstrates that Livecchi ever tendered the amount necessary to

repay the loan.  Although he contends that HUD never supplied him with the amount of the

outstanding indebtedness, the record demonstrates to the contrary.  (Tr. 620; *see* G. Exs. 29,

32-33, 35-42).  In addition, HUD did agree to postpone the foreclosure sale by two hours in order

to afford Livecchi the opportunity to make that payoff.  (G. Ex. 72).  He failed to do so.

Finally, the amount of income that Livecchi wrongfully retained during the period

of his default, nearly one-half million dollars, is significant.  That sum alone is evidence of

substantial fault.  So, too, is the manner in which those funds were handled and the use to which

they were put.  In contravention of the Regulatory Agreement, Livecchi did not deposit them into

a segregated account, but rather commingled then with funds from other properties and sources.

(Docket # 40 at 24 and n.8).  Livecchi then used funds from that non-segregated account to pay

for business expenses unrelated to the Project, as well as personal expenses, such as mortgage

payments for his residence, a fence for his son and furniture for his residence.  (Tr. 552-53).  This

evidence – that Livecchi wrongfully retained Project rental income of nearly one-half million

---

[15]  Although Livecchi points to one letter that he sent to HUD as evidence of his stated intention to pay off
the loan, the letter actually states his desire to work out a reinstatement plan.  (D. Ex. AAA).

dollars for a period of twenty months and used it for non-Project personal and business expenses – is itself sufficient to meet the standard of substantial or repeated fault.[16]

For all these reasons, I conclude that Livecchi has engaged in substantial and repeated fault and that double damages are justified. If double damages were not imposed, the only sanction that Livecchi would face would be the return of the income that he had no right to retain in the first place. Such a remedy, while serving to compensate the government, would serve little deterrent effect on other owners who default on their HUD-insured mortgages. Deterrence, after all, was precisely Congress' goal in enacting the double damages provision, *see Cofield*, 215 F.3d at 171; to overlook it would undermine the clear Congressional intent of the statute.

Any suggestion that double damages are not necessary because Livecchi's loss of equity in the Property serves that deterrent purpose is misplaced.[17] Any defaulting mortgagor risks forfeiting his or her equity in the property in the event that the property sells for less than the amount of the mortgage. That risk is a legal consequence of the decision to default on the mortgage. This case involves conduct separate and apart from the non-payment of a mortgage; it involves the mortgagor's decision to retain income earned by the Property, rather than to use it to pay the mortgage, knowing that the mortgagee has no contractual right to recover the unpaid

---

[16] I make this finding explicitly in the event that any reviewing court concludes that the question of substantial or repeated fault should be determined solely with reference to the conduct constituting a breach of 12 U.S.C. § 1715z-4a(a)(1).

[17] Livecchi's brief does not specifically advance this contention. Moreover, it appears inconsistent with his argument that HUD's loss of approximately $1.2 million as a result of the foreclosure should not be considered in evaluating the issue of repeated and substantial fault. (Docket # 98-2 at 3 n.3). As Livecchi argues, "HUD sustained the mortgage loss [as] a result of simple breach of contract." (*Id.*).

mortgage (by virtue on the non-recourse provision of the Regulatory Agreement). Congress fashioned a separate penalty – double damages – to serve as a deterrent to that conduct.

Finally, I reject Livecchi's contention that the imposition of double damages in this case is constitutionally barred by the due process clause because Livecchi never received notice of the possible penalty. *See Blanco v. El Pollo Loco, Inc.*, 2007 WL 1113997, *3 (C.D. Cal. 2007) ("[b]y their very nature, . . . , statutory damage provisions give a defendant notice of the severity of the penalty that may be imposed") (internal quotations omitted). After Continental assigned the mortgage to HUD, HUD wrote to Livecchi specifically advising him of the legal prohibition against using income from the Property for any purpose other than necessary operating expenses. (G. Ex. 29). The letter further informed Livecchi that the National Housing Act provided for penalties, including a "fine and/or imprisonment" in the event of a violation. (*Id.*). The letter also cited the statute at issue here, 12 U.S.C. § 1715z-4a, for guidance as to permissible expenses. (G. Ex. 29). Any review of that provision, including its subparts, would have put Livecchi on notice of the possible penalty of double damages. *See* § 1715z-4a(c).

In sum, I find that Livecchi should be required to pay double damages in this case. I reject Livecchi's argument that the imposition of double damages amounts to a "partial stripp[ing] of the benefit of his bargained for lack of personal liability on the note and mortgage." (Docket # 98-2 at 4). To the contrary, he has never lost the benefit of that bargain. This action is not an action to recover on the note and mortgage. It is an action to recover the damages caused by Livecchi's decision to keep and use income earned by the Project while not paying the mortgage. HUD did not bargain away its right to recover those wrongfully retained funds.

### III.  The Government's Application for Prejudgment Interest

   In addition to double damages, the government seeks an award of prejudgment interest.  (Docket # 97 at 57-58).  The statute is silent on the issue.  Livecchi's post-trial brief does not address the government's request.

   An award of prejudgment interest is committed to the sound discretion of the trial court.  *See, e.g.*, *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989) (prejudgment interest is "an element of [a plaintiff's] complete compensation"); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (whether to grant prejudgment interest and the rate to be used "are matters confided to the district court's broad discretion"), *cert. denied*, 522 U.S. 812 (1997); *Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 613-14 (2d Cir.) (same), *cert. denied*, 513 U.S. 873 (1994); *Lodges 743 & 1746 v. United Aircraft Corp.*, 534 F.2d 422, 446 (2d Cir. 1975) ("[w]hether to award prejudgment interest in cases arising under federal law has in the absence of a statutory directive been placed in the sound discretion of the district courts"), *cert. denied*, 429 U.S. 825 (1976).  Factors to be weighed in determining whether to make such an award include "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) consideration of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court."  *Wickham Contracting Co. v. Local Union No. 3, IBEW*, 955 F.2d 831, 833-34 (2d Cir.), *cert. denied*, 506 U.S. 946 (1992).  *Accord S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d at 1476.

   I find that such an award is justified in this case in order to make the government whole.  *See Cofield*, 215 F.3d at 168, 172 (affirming district court's award of prejudgment interest in action brought under 12 U.S.C. § 1715z-4a); *United States v. Harvey*, 68 F. Supp. 2d

1010, 1021 (S.D. Ind. 1998) (awarding interest to government pursuant to 12 U.S.C.

§ 1715z-4a(c)).  *See also Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000)

(considerations informing decision whether to award prejudgment interest include "the need to

fully compensate the wronged party for actual damages suffered"); *Mendez v. Teachers Ins. and

Annuity Ass'n and College Retirement Equities Fund*, 982 F.2d 783, 790 (2d Cir. 1992) (amount

should be "fair, equitable and necessary to compensate the wronged party fully") (internal

quotations omitted).  I further find that the government has correctly determined that the award

should cover the period from the day after the foreclosure sale until the date of judgment.

      I disagree with the government's position that interest should be calculated based

on the prime rate and compounded daily.  Rather, I find that prejudgment interest here should be

calculated using the more conservative methodology prescribed by Congress in 28 U.S.C. § 1961

for determining post-judgment interest.  *Security Ins. Co. of Hartford v. Old Dominion Freight

Line, Inc.*, 314 F. Supp. 2d 201, 204 (S.D.N.Y. 2003) ("[w]hile the [c]ourt has discretion to

award interest at a higher rate, it is reasonable to accept the considered judgment of the Congress

as to a fair interest rate absent some reason on the facts of the case to do otherwise").  Such an

approach in this case will achieve the aims of compensating the United States for the lost use of

the funds, while avoiding a windfall.  After all, the United States has been granted an award of

double damages.  On this record, and in the absence of any persuasive reason offered by the

government for adopting a higher rate of interest, I find that the methodology set forth in 28

U.S.C. § 1961 should be used to calculate prejudgment interest.

      Accordingly, I direct the government to recalculate prejudgment interest on the

award of $481,438 using the methodology set forth in 28 U.S.C. § 1961.  The government shall

submit its revised computation to Livecchi and counsel for CRL by no later than April 7, 2009.

Defendants shall submit any objections to that computation by April 14, 2009.


## IV.  Costs

Unlike prejudgment interest, the statute at issue in this case, 12 U.S.C.

§ 1715z-4a(c), authorizes an award of costs, including attorneys' fees and auditing fees.  The

government did not seek attorneys' fees at trial and offered no proof in support of such an award.

Following some testimony about auditing costs, the government withdrew its application for

auditing fees.  (Tr. 350).  Thus, the government may recover costs relating to this action, other

than attorneys' and auditors' fees.


## CONCLUSION

For the reasons stated above, judgment shall be entered in favor of the United

States in the amount of $962,876, plus prejudgment interest to be calculated on the sum of

$481,438 and costs.  Defendants' counterclaims are dismissed with prejudice.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
        March   31   , 2009